On motion to dissolve a restraining order, heard on bill and affidavits and answering affidavits.
Two corporations of this state, known as the Central Leather Company and The United States Leather Company, entered into an agreement to submit to the stockholders of the respective companies a proposal of merger or consolidation, under the provisions of the General Corporation act (Revision of 1896). The second named company was organized in 1893, with an authorized capital stock of $120,000,000 par value, divided equally between preferred and common stock. The Central Leather Company was incorporated in 1905. In 1909 *Page 544 
these two companies were merged into the defendant Central Leather Company and the existence of the old United States Leather Company being thus terminated there was, immediately thereafter, created a new company of the same name, which is the defendant United States Leather Company.
On June 23d 1927, the Central Leather Company and the last-named United States Leather Company caused the latter to be merged into the former, under terms and conditions hereinafter set out. From the time of the incorporation of the Central Leather Company in 1905 it prospered until the reconstruction period following the world war. It is a matter of general knowledge, which I think I may notice, that since the close of the war the leather industry has suffered perhaps more than any other class of business in America. In April, 1921, for the first time in its existence, the dividend on the preferred stock of the Central Leather Company was passed and it has never declared a dividend since.
The assets of the Central Leather Company exceeded its liabilities by about $53,000,000. Its capital indebtedness was very nearly $73,000,000, made up of a little more than $33,000,000 of the usual class of seven per cent. cumulative preferred stock having the ordinary attributes of stock so denominated, while there are slightly more than $39,000,000 of common stock of the usual description, so that there is a capital deficit of $19,000,000 of $20,000,000.
There are arrears of dividends on the preferred stock of approximately forty-three per cent. To meet this situation and attempt to revive the financial condition of the company so that the constantly-mounting accumulation of arrears of dividends might be stopped and the stockholders again be permitted to enjoy the natural income of their holdings, two committees were appointed by the directors, one consisting of preferred shareholders and the other of owners of the common stock. As a result of the activities of these committees, assisted by two large firms of investment bankers, a plan was evolved for the merging of the two companies, and on the 20th day of May, 1927, notice of a corporate meeting was given, to be held on June 22d 1927. *Page 545 
The details of the plan, so far as pertinent to this discussion, proposed that the corporation about to be formed by the merger should be empowered to issue a class of stock to be known as seven per cent. cumulative prior-preference stock with a par value of $100, to be entitled to cumulative dividends at the rate of seven per cent. per annum, and to authorize the issuing of one hundred and sixty thousand four hundred and ninety-six shares. This stock was to have the usual preference as to dividends and rights upon dissolution, and could be repurchased by the company for retirement at not less than $110 per share. Its holders were also entitled to elect two-thirds of the directors of the new corporation, until such time as $10,000,000 of this stock shall have been so retired.
There was proposed a second new class of stock to be known as class A participating and convertible stock. This was to be without par value and to draw dividends, in the discretion of the directors, whether earned or not, at the rate of $4 per share when, and if, declared, but only after satisfaction of the dividend requirements of the prior-preference stock, and an additional dividend on the class A stock not to exceed $2 per share when, and if, a dividend might be declared on the common stock. This extra dividend was to equal that on the common, up to $2, for any period.
Finally, there were to be authorized six hundred and forty-seven thousand seven hundred and fifty-three shares of common stock without par value. This stock was to enjoy the equal dividend above $4 per share that might be declared on the class A stock up to $2, and when all these requirements should have been met, then the common stock was to be entitled to all further dividends.
The plan contemplated that there should be issued and exchanged by the new corporation for every share of the old preferred stock turned in for cancellation, one-half a share of the new prior-preference stock at a par value of $50, three-quarters of a share of the class A stock, and the sum of $5 in cash. Thereupon, all accumulations of arrears of dividends on the old preferred stock were to be canceled. It *Page 546 
should have been said that a further privilege to the holders of class A stock was the right to convert the same into common stock at any time, share for share. The value placed upon the class A stock was approximately $31 per share.
At the meeting of June 22d, the complainant, Windhurst (who originally filed this bill), and others, appeared, protested against the adoption of the scheme, and voted in the negative. The result of the election was the casting of slightly more than ninety per cent. of the preferred stock in favor of the proposed change, with something more than nine thousand shares, or about three per cent., voted in opposition thereto. Of the common stock, upwards of eighty per cent. was voted favorably and none of it was voted adversely.
At the hearing of this motion, several additional parties complainant were admitted, and all the complainants together represent a little more than three thousand shares of the old preferred stock. On the day following the meeting of stockholders, the certificate was filed in the office of the secretary of state, and immediately thereafter a dividend was declared, payable August 1st, 1927. Approximately ninety-two thousand shares of preferred stock have been deposited for conversion, most if not all of the new stock issued therefor has been deposited with the members of a voting trust, and the certificates given in return therefor have been placed upon the market and are now being dealt in by the public.
A single ground is urged by the complainants for enjoining the payment of a dividend pendente lite and for the dissolution of the new company, although the point has two aspects. The complainants say that to permit a consummation of the scheme adopted at the meeting of the stockholders should be frustrated, because it deprives them of the accumulations of arrears of dividends on their old preferred stock. They charge, in the first place, that it is unfair, inequitable and oppressive, and done in the interest of the holders of the common stock; in the second place, they say that the accumulations have vested them with property rights that it is absolutely illegal to take from them. *Page 547 
Without entering into any extended discussion, it does not appear that the plan under which the new company was formed is inequitable. Each share of preferred stock entitles its holder to one-half share of prior-preference stock upon which he must be paid $3.50 with all accumulations before any earnings may be distributed to any other class. Next, such holder receives, in exchange for each old share, three-fourths of a share of class A stock, and, finally, $5 in cash. The class A stock has a second preference ahead of the common stock up to $4 per share, or at the rate of $3 per share to each exchanging holder of the old preferred stock. Thus he must be paid, under the new plan, not less than $6.50 in any given year for the conversion of his old holdings before the common stockholders can share with him. It is true that this is fifty cents a year loss, but that is a small item in saving a great industrial organization in which thousands of investors have placed their money, as the overwhelming majority seem to have thought when they voted.
It is equally true that a corrupt board of directors may pass dividends on the class A stock until a vast surplus shall have accumulated which may then be utilized, in part, to enrich the common stockholders. But certainly not until $10,000,000 worth of the prior-preference shares shall have been retired (which it is not apparent will be very soon) to say nothing of the right of the holders to convert class A into common stock. It should also be borne in mind that for six long years no income has been enjoyed by the holders of any class of shares.
So far as the dissolution rights of the old preferred stockholders are concerned, there is not the slightest prospect of that contingency ever materializing, and there is the further uncertainty as to the value of any of the shares if it does, as Vice-Chancellor Lane explained in the unreported case ofBrugler v. United States Machinery Co. (June 4th, 1917). There is disclosed in this case a situation requiring prompt attention, and while there may be some slight disadvantage to which the complainants will be placed if the new company is ever dissolved (which seems most unlikely) it is so remote a possibility that it does not seem to me the judgment of the *Page 548 
managing officers of the company, the experienced bankers by whom the plan was devised, and the overwhelming majority of the stockholders, should be overruled by a comparative handfull controlling approximately one per cent. of the preferred stock. The advantages and privileges accorded the holders of the prior-preference stock seem to at least off-set the disadvantage.
It is impossible for me to enter into an extensive examination of the question of the legality of the attacked procedure because of lack of time if this matter is to be decided before a failure to decide will amount to an injustice. My first impression is that the underlying rationale of Day v. United States CastIron Pipe and Foundry Co., 96 N.J. Eq. 736, is applicable. There, the situation presented was the payment of a dividend on the common stock out of a working capital reserve earned during years when the dividend was passed on non-cumulative preferred stock. The case sub judice does not present that precise question, but it does involve the right to adopt a policy over the objection of any of the preferred stockholders whereby the holders of the common stock may be permitted to share in the earnings of the company without a literal enforcement of the rights of such preferred stockholders, as those rights were fixed at the time of the creation of the company. Any vigilant, bonafide holder of a single share of such preferred stock, who is not in default himself, ought to secure the aid of this court to prevent any such interference with his contract rights. ChicagoCity Railway v. Allerton, 18 Wall. 233. Vice-Chancellor Emery's opinion in Colgate v. United States Leather Co.,73 N.J. Eq. 72, strongly supports this view, and the pertinent part thereof was not criticized by the court of errors and appeals, in reversing on other grounds, in 75 N.J. Eq. 229. But in that case the complainants were vigilant and filed their bill before the meeting of stockholders had even been convened, while here, the circumstances presently to be stated make it seem that this is a case where equity should refuse to interpose, and that position should be based squarely upon the situation that the complainants have permitted to arise without *Page 549 
having previously invoked the aid of this court to prevent it, accentuated and exaggerated by the circumstances under which the complainant, Windhurst, made his entrance into the matter.
It will be recalled that notice of the proposed change in the capital arrangement of the company was given to the stockholders on May 20th, 1927. It will be further recalled that Windhurst first acquired any holding on June 16th, or nearly a month thereafter and only six days before the plan was to be submitted to the stockholders. The messenger who delivered his certificates of stock was unable to find Windhurst's name in the directory of the building which he had given as his address. As the result of inquiry he appears to have delivered certificates to someone in the office of a firm of stock brokers, and the certificates appear to have found their way into the possession of that complainant. But no matter whether Windhurst is an employe of the firm mentioned by the messenger or not (and the proofs on that score consist only of hearsay), the fact remains that he became a stockholder before the meeting, attended the meeting, protested, voted against the resolution, and yet he allowed almost another month to elapse before filing his bill. No warning of this suit was given at the meeting. In the meantime, not only had the corporation changed its position, but other rights had been created without the slightest notice of this complainant's objections. A dividend had been declared, payable in a few weeks. Large numbers of stockholders in the old companies had entered into the voting trust, spoken of above. The corporation had expended large sums of money in and about the completion of the consolidation, and the certificates issued by the voting trustees had been dealt in on the stock market and the public thus had become involved. The company had expended about $1,250,000 as a part of the consideration for the surrender of the old preferred stock, which included $5 in cash for each share so surrendered. If this be not laches, I do not understand that doctrine. Pom.Eq. Jur. (2d ed.) §§ 1440, 1442; Dana v. American TobaccoCo., 72 N.J. Eq. 44; affirmed, 73 N.J. Eq. 736. *Page 550 
Sight has not been lost of the limitation upon the effect of an unexcused delay by the actor, where he enters equity to preserve a strict legal right. Prof. Pomeroy says that the preponderance of authority favors this exception to the doctrine.Pom. Eq. Jur. (4th ed.) § 1445. If this were a matter solely between the complainants and the defendants much might be said for it. But what is to be said as to the effect upon third parties in nearly all parts of the civilized world who are, and have been, investing innocently in certificates brought into being as the result of the merger that is now attacked? Compliance with the prayer of the complainants would deny to them the receipt of the dividends upon which they have a right to count and would seriously diminish the benefits of their investments (or completely destroy them) — all without any fault upon their part. In these circumstances, and considering the hardship upon the defendants and their shareholders, it seems to me that the chancellor should pause before disturbing an accomplished status, with a result so far-reaching and injurious.
I do not wish to be understood as placing this decision upon the discretion of the chancellor in applications for injunctionspendente lite. Counsel for the defendants has argued as if he assumes this to be a preliminary hearing, which, of course, it literally is. In truth and in substance, however, it is really a final determination, as Vice-Chancellor Lane pointed out inBrugler v. United Shoe Machinery Co., supra. The facts have been most completely presented. There is not a dispute as to them; and the completest opportunity for argument has been afforded. It is inconceivable that any additional facts could be proved at a subsequent hearing that would in anywise affect the determination of the cause.
I suppose that every suit of this sort must be judged upon its own particular facts and circumstances. It is not the case of enjoining an ultra vires act of the corporation, because the statute expressly permits the merger and leaves the details of the operation to a two-thirds majority of each class of stock. Of course, if there was any question of fraudulently attempting to enrich one class of stockholders by the *Page 551 
impoverishment of another class, the reports are filled with cases making it the duty of this court to protect the latter. But surely there must be some degree of common sense exercised in the application of principles and precedents. There isn't a circumstance to indicate any malevolent motive in the minds of the men who built up the plan to save a large industrial corporation that had, through no fault of its managers but through stress of circumstances, become helpless. The scheme adopted may not be perfect, but it would appear to me to make the condition of the company and its stockholders far better. If the position of the complainants appears worse on paper, it would seem that their actual condition will be far better than it was when they held certificates that the company was unable to convert into income-producing securities.
It might just as well be frankly said that there is no question in my mind that Windhurst bought into the situation for the purpose of commencing this suit or otherwise to compel the purchase of his stock at a price to be fixed by him. That apparently is not so in the case of the other complainants, but they have been as slothful as he has been, if not even more so. There is no use in mincing words. Lawyers do not necessarily lose all memory of the experience gained at the bar. It is quite amazing to me that only three other holders of preferred stock in the old companies have been induced to join in a suit where there is everything to be gained and nothing to be lost, and one of these has made an election which bars him from participation. Chancellor Walker said, in Aldrich v. Union Bag and Paper Co.,81 N.J. Eq. 244, that where a bill is filed against a corporation (in that case to secure the appointment of a receiver) by the holders of a very small percentage of its shares, that fact may be given its due weight in balancing conveniences. That similar reasoning might be applied to a bill of the kind found here seems to me indubitable. Vice-Chancellor Lane said, in General Investment Co. v. Bethlehem Steel Corp.,88 N.J. Eq. 237, that his decision was arrived at purely by considering the relative conveniences of the respective parties. While I cannot *Page 552 
say that Windhurst is a "professional privateer," as the vice-chancellor said of Clarence Venner, still, it would seem from a mere statement of the circumstances of his expedition into the troubled sea of the defendants' affairs that his venture was not entirely free of a piratical character.
The complainants say that they could not have initiated this suit until after the adoption of the resolution at the stockholders' meeting, because of what was said by the court of errors and appeals in Grausman v. Porto Rican-American TobaccoCo., 95 N.J. Eq. 223. There, a temporary restraint was allowed in this court, restraining the corporation from holding a meeting to vote on a proposed amendment of its certificate, and the appellate court said that the bill was prematurely filed. It did not say that the completion of the amendment could not have been enjoined, but placed its decision upon the possibility that if the meeting had been allowed to proceed, enough of the stockholders might have changed their minds, so that the resolution would have been defeated, or that a full discussion of its merits might have persuaded the objecting stockholders to vote for it. The complainant in the case at bar says that if it is premature to enjoin the meeting it would be equally premature to enjoin the completion of the amendment of the certificate, because that action might not be taken, even if authorized. I do not think that any extended answer to this argument should be necessary, and that it is sufficient to say that although the court of errors and appeals raised the point upon which they decided the Grausman Case (at p. 227), no such question was raised or decided by the court in the later case of GeneralInvestment Co. v. American Hide and Leather Co., 98 N.J. Eq. 326,
where the members were permitted to assemble and vote on the question under consideration, but all subsequent proceedings thereon were stayed.
I feel, as Vice-Chancellor Lane felt in the Bethlehem SteelCase, supra, that no relief should be afforded the complainants in this court. In view of their conduct, they should be left to their remedy at law. In view of the ability of the company to respond to any judgment that may be obtained, no bond appears to be necessary. *Page 553 
The determination to which I have come obviously makes it unnecessary to consider any of the other points raised on behalf of the defendants.
The order to show cause should be discharged, the temporary restraint should be dissolved, and the temporary injunction (which would, in effect, be a perpetual injunction) sought by the complainants should be denied. In view of what I said in the supplemental opinion filed in Grausman v. Porto Rican-AmericanTobacco Co. supra (commencing at p. 166), it will be apparent that I have not lost sight of the grave consequences that might be entailed upon a party by depriving him of the right to review the court of first instance by allowing the subject-matter of the appeal to be virtually destroyed. But even with those considerations in mind, it does not seem to me that the effect of this decision should be stayed under the one hundred and thirteenth section of the Chancery act. If it shall be determined that I have fallen into error, the appellants will not be deprived of redress, as Vice-Chancellor Lane pointed out inBrugler v. United States Shoe Machinery Co., supra. On the other hand, to stay the effect of the dissolution would be disastrous, even in case of a reversal. *Page 554