[No. 30415. Department One. June 14, 1948.]

ROY V. STEWART *et al.*, *Appellants*, v. ERIC A. JOHNSTON *et al.*, *Respondents*.[1]

[1]Reported in 195 P. (2d) 119.

*A. O. Colburn* and *Harvey Clarke*, for appellants.

*Charles P. Lund* and *Graves, Kizer & Graves*, for respondents.

HILL, J.—In 1933, the Washington Brick, Lime and Sewer Pipe Company had fallen upon evil days. In the depths of the depression there were no orders for bricks or terra cotta and the company was insolvent within the purview of Rem. Rev. Stat., § 741 (now Rem. Rev. Stat. (Sup.), § 741 [P.P.C. § 91-3]), and a receiver was about to be appointed in an action then pending. To forestall the receivership, a trust deed to Eric A. Johnston, for the benefit of its creditors, was executed by the corporation on July 20, 1933, which trust deed covered all of its property, real, personal, and mixed. This trust deed gave him power to carry on the business or to sell the property if and when it appeared to him that further operation was not in the best interests of the property. Prior to the execution of this trust deed and since May, 1919, Mr. A. B. Fosseen had been president of the corporation.

Appellant Burkhalter testified that, in 1933, the value of the properties of the corporation was at least seven hundred fifty thousand dollars, "but I don't believe anybody would need to invest that much money in obtaining control of it." At the time of the execution of the trust deed, the obligations, exclusive of those to preferred stockholders, totaled about two hundred thirty-two thousand dollars, of which thirty-five thousand dollars was for taxes, which were then five years in arrears, and thirty-five thousand dollars for labor. From Mr. Johnston's testimony, it would be gathered that there was a serious question whether, if the assets and properties of the company had been sold at that time, enough would have been realized to meet those obligations. He concluded that the only chance ultimately to pay the creditors in full was through operation of the company's properties, and he borrowed operating capital for that purpose.

The operation of the company during the trusteeship was very successful, and within the first three years of operation three quarters or more of the indebtedness was paid and it was evident that continued profitable operation was possible. Respondents attribute this primarily to Mr. Johnston's services; and appellants attribute it, in large part at least, to an increased demand for building materials.

In 1937, there occurred a transaction to which the briefs on both sides devote much space. Neal Fosseen acquired an option covering the stock owned by his father, A. B. Fosseen, in the Washington Brick, Lime and Sewer Pipe Company, namely, 1,695½ shares of preferred stock and 1,840 shares of common stock. The option price was two hundred dollars a month, payable to A. B. Fosseen and Florence N. Fosseen, his wife, and continuing until the death of the survivor of them. (A. B. Fosseen was then sixty and his wife fifty years of age.) Under the terms of the option agreement, new stock certificates were to be issued in the name of Neal Fosseen, and it was agreed that

". . . in the event of the issuance of new securities for the shares of stock covered hereby, by reason of reorganization, consolidation, merger, or otherwise, of Wash-

ington Brick Lime & Sewer Pipe Co., said securities so issued shall be substituted for the shares of stock hereinabove described."

Neal Fosseen was at that time working for the trustee at a salary of two hundred dollars a month. Immediately thereafter, his salary was raised to four hundred dollars a month, his father withdrew from any salaried position with the company, and Neal assumed his father's duties, whatever they may have been.

Thereafter, Neal Fosseen was the leading figure in the proceedings leading to the transfer of the assets of the Washington Brick, Lime and Sewer Pipe Company, which will hereafter be referred to as the old company, to the Washington Brick and Lime Company, which will hereafter be referred to as the new company. He, with the assistance and counsel of others, presented a plan whereby all the assets of the old company would be transferred to the new company in full payment for the entire capital stock of the new company, *i. e.*, 260,000 shares with a par value of one dollar a share. The stockholders of the old company were to receive ten shares of the stock of the new company for each share of preferred in the old, and one share in the new for each share of common in the old. Thus, 92,445 shares of the stock of the new company would be allocated to the holders of 9,244½ shares of preferred in the old company and 9,218 shares would be allocated to holders of the 9,217¾ shares of common in the old company. This allocation left 158,337 shares, which were to be left in the treasury of the new company to provide working capital. The shareholders of the old company were to be given the privilege of purchasing this stock at the rate of twenty-five cents a share.

This plan was approved by six of the eight directors of the old company, appellant Burkhalter and A. B. Fosseen being the directors who did not approve. At a meeting of the stockholders of the old company on May 24, 1938, it was approved by 6,650 shares of preferred stock and 5,552 shares of common stock. Against the proposal were only three shares of common stock, with 122 shares of preferred

and 41 shares of common stock represented but not voting. The rest of the stock was not represented at the meeting.

Appellant Burkhalter owned fifty shares of the preferred stock recorded as not voting. Appellant Stewart, who owned 120½ shares of preferred stock of the old company, was in Spokane on the day of the meeting and knew that it was being held but did not attend. Thereafter, the plan was ratified by an additional 889 shares of the preferred stock and 1,669 shares of the common stock, making an affirmative approval by more than two thirds of both the preferred and common stock of the old company.

Only eleven stockholders availed themselves of the privilege of purchasing additional shares at twenty-five cents a share, and they purchased only 8,557 shares. At the urgent request of the directors of the new company and in pursuance of a formal resolution of March 17, 1939, requesting him so to do, Eric A. Johnston bought 23,500 shares for $5,875, or twenty-five cents a share, which purchase appellants regard as highly reprehensible. (Mr. Johnston has subsequently acquired additional stock and, at the time of trial, owned 26,631 shares.)

On April 17, 1943, the actual transfer of the assets of the old company to the new company was made by the trustee, and the new company has operated very profitably at all times subsequent thereto. (A quarterly dividend was paid in October, 1943, and a dividend was paid each quarter thereafter up to the time of trial. Total dividends to that date amounted to thirty-nine cents a share.) Due to oversight and the fact that Mr. Johnston was not in Spokane during the greater part of the intervening time, the deed by the trustee transferring the real property of the old company to the new company was not executed until December 21, 1945.

That reorganization of the old company was essential to successful operation was apparent. It is conceded that there were 9,244½ shares of preferred stock outstanding. This preferred stock had a par value of one hundred dollars a share and called for cumulative annual dividends of

eight per cent, to be computed from July 1, 1910, or any subsequent date of issue. No dividends had ever been paid on this stock, and in the spring of 1938, when the proposed plan of reorganization was under consideration by the trustee and stockholders, preferred and common, the accrued and unpaid dividends amounted to almost two million dollars, to which would be added another $73,956 on July 10th of that year. The by-laws of the old company provided that the preferred stock should be paid out of the assets of the company in the event of dissolution, before anything was paid on the common stock.

Appellants criticize the reorganization plan as adopted because it recognized rights on the part of the common stockholders. Appellants insist that, since all of the assets of the company could not have paid off the amount due the preferred stockholders, the latter were entitled, in the event of dissolution, to all of the property of the corporation; and that the entire control of any new corporation should be vested exclusively in them. They also criticize the plan because it reduces the proportionate interest of the preferred stockholders and makes it possible, by the sale of treasury stock, to deprive the preferred stockholders of control of the corporation. They urge that, conceding the necessity of reorganization, it could have been done by amending the articles of incorporation of the old company. They raise the issue that the authorization of the sale and transfer of the assets of the old company to the new was carried out under the terms and provisions of the uniform business corporations act, adopted by this state in 1933, and in violation of rights they had acquired prior to the effective date of that act. Weight is given to their position by our reasoning and holding in the very recent case of *State ex rel. Swanson v. Perham, ante* p. 368, 191 P. (2d) 689.

We have very briefly indicated some of the contentions of the appellants because the basis on which this case is to be decided makes an extended consideration of them unnecessary. Enough has been said to indicate that important and substantial issues are raised.

Appellants, as owners of preferred stock of the old company, brought this action praying for the following relief:

"(1) That the Washington Brick, Lime and Sewer Pipe Company be rehabilitated and restored to its former stockholders and corporate set-up as of July 20, 1933.

"(2) That the defendant [respondent] Eric Johnston, as trustee under said assignment and trust agreement, be required to fully account for all of his transactions and dealings with said corporate assets that passed to his hands by virtue of said assignment and transfer so that the court can determine what properties, accounts, claims and assets of every nature and kind should be restored to said Washington Brick, Lime and Sewer Pipe Company.

"(3) That said Washington Brick, Lime and Sewer Pipe Company be declared to be the owner of all of said assets and all other assets to which the assets as of July 20, 1933 have been converted.

"(4) That said Washington Brick and Lime Company [respondent] be declared to be illegally incorporated and that it be dissolved and prohibited from doing business in the State of Washington or elsewhere and the trustees thereof [respondents] be declared to be trustees for the sole use and benefit of the Washington Brick, Lime and Sewer Pipe Company, and ordered and directed to transfer said assets to the Washington Brick, Lime and Sewer Pipe Company.

"(5) That the court take an account of all damages or loss suffered by reason of the improper handling or disposition of said trust estate by defendants or either or all of them and there be awarded judgment in favor of the Washington Brick, Lime and Sewer Pipe Company for such loss or damage against such defendants as may be held responsible therefor.

"(6) That defendant Eric Johnston be declared to be entitled to no compensation for performing his duties as trustee because of his breach of said trust.

"(7) That plaintiffs [appellants] be given judgment for their expenditures and reasonable attorney's fees to be paid out of said trust estate and for such other and further relief as to the court may seem just and proper."

The trial court found that the appellants had failed to establish grounds for equitable relief, and further found that any right to relief was barred by their laches.

The brief of the respondents is, to a very considerable extent, a panegyric on the motives, ability, and accomplishments of Eric A. Johnston and Neal R. Fosseen, and becomes almost lyrical in its praise. On the other hand, the appellants in their brief seek to minimize the accomplishments of Johnston and Fosseen and are vitriolic and corrosive on the question of motives.—All of which has been very interesting but not particularly helpful in the determination of the questions presented to the court.

■ We have come to the conclusion that the questions of the legality or illegality of the method pursued in bringing about the transfer of the assets of the old company to the new, whether or not the preferred stockholders were deprived of contractual and constitutional rights, and the other issues raised by the appellants, cannot be litigated in this proceeding because their right to maintain such an action is barred by their laches.

As the trial court pointed out, appellants are not ignorant or illiterate; they are intelligent, able, and well-informed. Appellant Burkhalter knew, and appellant Stewart knew or could easily have found out, every move that was being made by Neal Fosseen and the others who were interested in accomplishing the transfer of the assets of the old company to the new. There was no concealment and no attempted concealment of their purpose throughout. This knowledge by appellants and the absence of any concealment of the purposes and objectives of the majority stockholders and directors, distinguishes this from practically all of the cases relied upon by appellants.

The appellants have known since prior to May 24, 1938, just exactly what was intended to be done; it was outlined in minute detail, even to the fact that it was intended to induce Mr. Johnston, the trustee, to interest himself in the new company. The appellants knew that, relying upon the action of the stockholders taken on May 24, 1938, a new corporation would be organized and the assets of the old would be transferred to it. They knew that the new company was promptly organized and that by January, 1939, the stockholders had commenced to transfer their preferred

and common stock in the old company for stock in the new company. Notice of all meetings of stockholders of the new company was regularly mailed to both appellants. Mr. Burkhalter remained as an employee of the trustee until 1940. He knew of the efforts to get the stockholders of the old company to surrender their stock and accept stock in the new company, and that it was claimed that eighty per cent had done so. (By the time of trial, more than ninety-one per cent of the preferred stock had been surrendered and stock in the new company issued therefor.) He knew that the new company had purchased a lime plant in Oregon, and that the operations of the old and new companies were being merged even while the trusteeship continued. He testified:

"It was very difficult to know any difference between the two properties,—the two companies, in our operation. You could not tell where one began and where one left off in the ordinary conduct of the business. The only occasion where the trustee's name would be specifically noted would be on such things as payroll checks and maybe on some of our ordinary stationery, and our invoices, they went out as Washington Brick and Lime Company—were carried on as Washington Brick and Lime Company."

Appellants alleged in their complaint that:

"Shortly after said new corporation was formed it took over the entire assets of said Washington Brick, Lime & Sewer Pipe Company and carried on the business thereof without interruption with the consent and approval of all defendants except A. B. Fosseen and has converted said assets to its own use. Said corporation by reason of the facts above alleged has been and is now a mere agency of defendant Eric Johnston, as trustee for the Washington Brick, Lime and Sewer Pipe Company. Said new corporation as such never had any assets of its own and did not buy said assets. Nor did it ever pay for said assets. The only consideration paid other than the issuance of stock as aforesaid was that said new corporation agreed to pay and assume all the debts and obligations of the old corporation.

"At the time of said appropriation a number of owners of the stock of the Washington Brick, Lime and Sewer Pipe Company also owned and controlled together with Eric Johnston all of the stock of the Washington Brick and Lime

Company and entirely dominated and controlled and still dominate and control said corporation. Said corporation had and still has practically the same officers and directors as the Washington Brick, Lime and Sewer Pipe Company. All of the expenses of said new corporation were paid out of the assets of the old corporation."

Knowing all of these things (if we assume the allegations to be true) and believing the reorganization was illegal and inequitable, appellant Stewart took no action until the present case was commenced, and appellant Burkhalter took no action until April, 1943, just at the time Mr. Johnston actually terminated the trusteeship and the new company took over the complete operation of all the properties of the old company. Just what the character of the action taken at that time was, is not clear, but it involved a suit against Eric A. Johnston, individually and as trustee, and the new company and seven of the trustees of the old company. No pleadings in that case are before this court. A memorandum opinion therein dated October 28, 1943, announcing that demurrers to the complaint would be overruled, is an exhibit herein. The record shows that that action was dismissed without prejudice more than three years later, on December 14, 1946, and subsequent to the commencement of the present action.

There is a serious question as to whether Burkhalter's right to equitable relief was not already barred by laches when he commenced his suit in April, 1943; but his delay to take any action, so far as the record before us shows, for almost two years and six months after the demurrers to his complaint had been overruled in the 1943 proceeding, is in itself laches under the circumstances here existing. During that entire period, the new company was operating and improving the properties and paying dividends to its stockholders.

Appellant Stewart is in no better position. He was not in Spokane after 1939, but he was in contact with A. B. Fosseen and appellant Burkhalter. He knew of Burkhalter's suit in 1943 and did nothing himself. Nor could he await the outcome of another stockholder's suit which was

not being diligently prosecuted. As we said in *Lindblom v. Johnston*, 92 Wash. 171, 176, 158 Pac. 972:

"It [laches] does not arise from mere lapse of time alone, but arises upon lapse of time together with some intervening change in the condition or relation of the parties adversely affecting the rights of the parties sought to be charged. To constitute laches not only must there have been delay in the assertion of the claim, but some change of condition must have occurred which would make it inequitable to enforce the claim."

The foregoing was quoted and approved in *McKnight v. Basilides*, 19 Wn. (2d) 391, 400, 143 P. (2d) 307.

■ Laches is a defense to an action brought by a minority stockholder.

"A stockholder who has the right to object to a consolidation, merger, reorganization, or sale of the corporate assets may lose this right by laches, if, having knowledge of the facts, he has delayed the assertion of his rights until the rights of third persons have intervened, or the defendants have expended money or incurred liabilities in reliance on the complainant's apparent acquiescence in what has been done, or it would be inequitable for any reason to grant the relief sought. . . .

"The delay which will constitute laches cannot be answered in any general way." 13 Am. Jur. 1118, § 1225.

"A court of equity will not allow a dissenting shareholder to object to a sale of the assets of a corporation if he is guilty of laches; that is, if, having knowledge of the facts, he has delayed the assertion of his rights until the rights of third persons have intervened, or the defendants have expended money or incurred liabilities in reliance on the complainant's apparent acquiescence in what has been done, or it would be inequitable for any reason to grant the relief sought." 70 A. L. R. 53, annotation.

"There is no question but that the right, if any, to attack a transfer or purchase for reorganization, or the reorganization itself, may be barred by laches, for along with the policy of encouraging reorganizations, goes that of requiring prompt action by those who claim that their rights have been injuriously affected." 15 Fletcher Cyclopedia Corporations (Perm. ed.) 574, § 7350.

"A court of equity moves upon consideration of conscience, good faith and reasonable diligence. Knowledge

and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of as wrongful and the bringing of suit to prevent or correct the wrong does not, in itself, determine the question of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid down. Change of position on the part of those affected by nonaction, and the intervention of rights are factors of supreme importance. The promptness of action demanded of a stockholder objecting to the accomplishment of a proposed corporate act which, although unauthorized, is capable of ratification, is dependent in a large degree upon the effect of his delay on others; and where many persons will be affected by an act that involves a change of capital structure and a material alteration of rights attached to stock ownership, the stockholder, having knowledge of the contemplated action, owes a duty both to the corporation and to the stockholders to act with the promptness demanded by the particular circumstances." *Federal United Corp. v. Havender*, 17 Del. App. Ch. 318, 345, 11 A. (2d) 331, 343.

In the case last quoted, there is an enumeration of instances in which delays of from one to ten months have been held to constitute laches. We have here comparable circumstances, with less emphatic protests on the part of the appellants and with far greater delay.

█ Appellants take the position that no action was required until the deed executed by the trustee in December, 1945, was recorded on January 15, 1946. The answer is that laches begins with the invasion of the plaintiff's right of which he has knowledge. The execution of this deed was a necessary but purely formal confirmation of what had been accomplished, to all intents and purposes, more than two years earlier, when the trustee terminated the trusteeship and transferred possession of all the property to the new company. His final report as trustee had been approved at a stockholders' meeting of the new company on April 17, 1943. The appellants had then had more than five years to enjoin the action which was consummated that day. They then waited another three years before they sought to have it rescinded.

Appellants seek to circumvent the application of the equitable rules governing laches by raising the issue of trust relationship, and insist that the statute of limitation does not begin to run against a *cestui que trust* until he has knowledge that the trustee unequivocally repudiates his trust. *Keyes v. Tacoma,* 12 Wn. (2d) 54, 56-57, 120 P. (2d) 533; *Longview v. Longview Co.,* 21 Wn. (2d) 248, 255, 150 P. (2d) 395; and the attendant rule requiring no diligence on the part of the *cestui que trust* until there is a repudiation of the trust.

The fallacy of this argument lies first in the fact that Johnston was a trustee for the benefit of creditors and that appellants, as holders of preferred stock, were not creditors and were trustors or assignors instead of *cestuis que trustent* or beneficiaries. Stevens on Corporations 364; 13 Am. Jur. 466, § 414; 11 Fletcher Cyclopedia Corporations (Perm. ed.) 727, § 5295 *et seq.; Moy v. Colonial Finance Corp.,* 283 Pa. 323, 129 Atl. 115, 40 A. L. R. 271. It clearly was never intended that the trustee was to pay off the accrued dividends of the preferred stockholders. Their right was to be paid if, as, and when there were profits sufficient to justify a dividend. *Keller v. Wilson & Co.,* 14 Del. App. Ch. 391, 190 Atl. 115; *Austin v. Wright,* 156 Wash. 24, 286 Pac. 48; Rem. Rev. Stat. (Sup.), § 3803-24 [P.P.C. § 447-1] (4a).

If the appellants occupied the position of *cestuis que trustent,* the trustees were the directors of the old company, who were charged with protecting the interests of the stockholders; and six of the eight of them had, prior to May 24, 1938, unequivocally expressed their approval of transferring all of the assets of the old company to the new company. If appellants' rights as preferred stockholders were being impaired, and if the old company was being "sold down the river" by its directors in violation of their trust, the appellants knew of this unequivocal repudiation of that trust in 1938 or 1939, when the same six directors of the old company became directors in the new.

It may further be pointed out that, if Eric A. Johnston was a trustee for the benefit of the appellants, which we do

not believe to have been the case, his intention to recognize the instructions of the old company to transfer its assets to the new company had been known since January 26, 1939 (exhibit No. 18). In transferring the assets of the old company to the new, he was carrying out a plan approved by six of eight directors and more than two thirds of both the preferred and common stock of the old company.

Appellants insist that laches is inapplicable unless some prejudice to innocent parties has resulted from the delay, and that all the elements of an estoppel must be present.

 It should be remembered that we are here dealing with appellants' right to a particular equitable remedy, not with their property rights or with their remedy at law. The language of 3 Pomeroy's Equity Jurisprudence (5th ed.) 245, 249, § 817, presents one answer to appellants' contention:

"Acquiescence in the wrongful conduct of another by which one's rights are invaded may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled. This form of *quasi* estoppel does not cut off the party's title, nor his remedy at law; it simply bars his right to equitable relief, and leaves him to his legal actions alone. In order that this effect may be produced, the acquiescence must be with knowledge of the wrongful acts themselves, and of their injurious consequences; it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal, or moral necessity, and it must last for an unreasonable length of time, so that it will be inequitable even to the wrong-doer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested, and his conduct apparently acquiesced in. It follows that what will amount to a sufficient acquiescence in any particular case must largely depend upon its own special circumstances. . . . The same rule applies, and for the same reasons, to a party seeking purely equitable relief against fraud, such as the surrender or cancellation of securities, the annulling of a transaction, and the like. Upon obtaining knowledge of the facts, he should commence the proceedings for relief as soon as reasonably possible. Acquiescence consisting of unnecessary delay after such knowledge will defeat the equitable relief."

See *De Boe v. Prentice Packing & Storage Co.*, 172 Wash. 514, 520-521, 20 P. (2d) 1107, for a comprehensive consideration by this court of what constitutes acquiescence. It is clear that mere protest, when the necessity for more decisive action is apparent, can constitute such acquiescence as will form a basis for the application of the doctrine of laches. *Penn Mut. Life Ins. Co. v. Austin*, 168 U. S. 685, 42 L. Ed. 626, 18 S. Ct. 223; *Kessler & Co. v. Ensley Co.*, 141 Fed. 130 (affirmed, 148 Fed. 1019; certiorari denied, 205 U. S. 541, 51 L. Ed. 921, 27 S. Ct. 788); *Federal United Corp. v. Havender*, 17 Del. App. Ch. 318, 11 A. (2d) 331; *Windhurst v. Central Leather Co.*, 101 N. J. Eq. 543, 138 Atl. 772; *Boston & Providence R. Corp. v. New York & New England R. Co.*, 13 R. I. 260, 264-265; *Emerson v. New York & New England R. Co.*, 14 R. I. 555, 559; *Narragansett Electric Lighting Co. v. Sabre*, 51 R. I. 37, 150 Atl. 756, 70 A. L. R. 46; *Wright v. Tacoma Gas & Electric Light Co.*, 53 Wash. 262, 101 Pac. 865; *Smith v. Stone*, 21 Wyo. 62, 128 Pac. 612.

The case of *Narragansett Electric Lighting Co. v. Sabre*, *supra*, seems particularly apropos. Minority stockholders there, as here, were contending that a transfer of the assets of the corporation in which they held stock to a new company could not validly be made. They had attended a protest meeting and filed a written protest. There, as here, the stockholders, "for many months before the sale was effected . . . had knowledge of the fact that a sale was contemplated." There, as here, the sale or transfer was approved at a stockholders' meeting, and the dissident stockholders could not have had any reasonable doubt but that the sale would be made unless enjoined. The court there said:

"Assuming that the legislative procedure in adopting said act of incorporation was insufficient to authorize a valid transfer by the old company of all of its assets to the new company,—but upon this question we express no opinion— said respondents must meet the question of their own laches before they can obtain an order for a re-transfer of assets to the old company and for the re-establishment of said company. The question of laches is so vital that it should be settled at the first opportunity. . . .

"Our determination is that the respondents by reason of their own laches, are not entitled to question the validity of the sale and transfer of assets. With full knowledge of the facts and ample time within which to act they choose to stand by and permit the transfer of assets, the acquisition of other property to be used in connection therewith, the assumption of contract obligations, the sale of a large amount of securities to investors purchasing in good faith, and permit the old company to distribute as dividends in liquidation a very large percentage of the purchase price which was the sole assets of said company after the transfer. Equity and good conscience do not permit one to avoid a sale and thereby cause great and irreparable injury to others, some, at least, of whom are innocent of wrong, after negligently waiting until the harm is done, instead of timely raising the question of the validity of such proposed sale by application to some proper tribunal. . . .

"The respondents not only knew that a transfer would be made but were advised by able counsel and knew that if they wished to avoid the sale it was their duty to ask for affirmative relief and thereby obtain an adjudication of the legal questions, which they desired to raise against the validity of such transfer, before irreparable injury would be done to the old company, the new company and the investors who thereafter purchased the securities issued against the transferred assets as property of the new company. The respondents do not attempt to excuse their delay other than by stating that they relied upon the protest, but they were not justified in assuming that their protest at the stockholder's meeting would avail to prevent the transfer of assets."

We recognize that the Narragansett Electric Lighting Company was a public service corporation, and that a court of equity will more readily consider laches when public service corporations are concerned; but the reasoning is applicable to the present situation. There the court stressed that the new company had operated "for over two months," whereas here the new company had been in existence for more than seven years and had been in possession of all of the property of the old company and had had the exclusive operation of it for more than three years.

Appellants here, excusing the fact that they did not even vote against the proposed reorganization and transfer of the assets to the new company, cite authorities to the

effect that it was not necessary for them to protest. But even where a protest has been made, as in the *Narragansett* case or *Mackall v. Casilear,* 137 U. S. 556, 34 L. Ed. 776, 11 S. Ct. 178, the mere assertion of a claim, unaccompanied by any act to give effect to it, cannot avail to keep alive a right which would be precluded by failure to prosecute it diligently.

Considerable reliance is placed by appellants on the suit by Burkhalter in 1943 as exculpating them from laches. What rights Burkhalter asserted in that suit, or what remedies he sought, we do not know. The appellants seem content to establish that there was a suit started in April of 1943 and that it was dismissed December 14, 1946. The respondents introduced a memorandum decision showing that demurrers to the complaint were overruled on October 28, 1943. We have adopted a court rule that says, in effect, that a delay in prosecuting a case for a year is such lack of diligence that the case will be dismissed. Rule of Practice 3, 18 Wn. (2d) 32-a. To have a case pending for three years without any diligent prosecution of it bespeaks lack of interest or lack of confidence in the cause of action and is much more indicative of laches than of diligence.

New investors—and the record shows some seventy-three new stockholders holding more than thirty thousand shares of the new company—presumably are innocent of any wrong. (A comparison of exhibit No. 10, a list of the present stockholders of the new company, with exhibit No. 9, a list of the stockholders of the old company, shows eighty-eight names on the former which do not appear on the latter, with total stock holdings of 35,094 shares. However, as to fifteen of such stockholders, it could be inferred from the similarity of names and holdings that they are heirs of stockholders listed on exhibit No. 9; their holdings amount to 4,725 shares. We therefore conclude that the record shows seventy-three new stockholders with 30,369 shares of stock. This was practically twenty-five per cent of the 123,715¾ shares outstanding at the time of trial.) It seems to us that, under the most restrictive rule applicable to laches contended for by the appellants, they have waited

until innocent third parties' rights have intervened, and that old and new investors have been irreparably prejudiced by appellants' long delay.

Appellants seek to excuse their delay, but we are not impressed by the explanation which they offer for their failure to commence this action at a much earlier date. Burkhalter relies upon the facts that he was employed by the trustee from 1933 to 1940 and did not want to prejudice his position, and that thereafter he had difficulty in finding counsel. Inadequate as that excuse is, he makes no explanation of the fact that after the demurrers to his complaint in the 1943 action were overruled, he delayed for two and one-half years either to press that action or to start another.

Stewart's explanation is that he was employed by the state of Washington in 1938 and subsequent years, and that the then governor was so close an associate of Eric A. Johnston that he would have imperiled his position and his livelihood had he commenced an action against the trustee or the new corporation. There was a change of governors in January, 1940, and that excuse for inaction, if by any stretch of the imagination it could be considered an excuse, then ceased to have any validity. Stewart admits that he was in frequent contact with Burkhalter and A. B. Fosseen.

We find no cases where circumstances such as existed here were considered as excuses for delay in taking prompt action, either to restrain the transfer of assets of an old company for stock of a new, or to set the transfer aside after it was consummated.

We have considered what we have deemed the more substantial objections which the appellants have raised to the application of the doctrine of laches to this case. Without further prolonging the discussion of laches, we would say that a quite extensive search among the cases in which the doctrine has been considered has left us with the feeling that there are few cases which present such compelling reasons for the application of that doctrine as the present.

Appellants contend that, if they are not entitled to the equitable relief requested, they are entitled to a judgment for the par value of their preferred stock plus accrued

dividends from 1910, at eight per cent. In support of that proposition, appellants cite many cases which have no apparent application. They do, however, cite a series of cases, mostly from New Jersey and Delaware, such as *Pronick v. Spirits Distributing Co.*, 58 N. J. Eq. 97, 42 Atl. 586; *Colgate v. United States Leather Co.*, 73 N. J. Eq. 72, 67 Atl. 657; *Lonsdale Securities Corp. v. International Mercantile Marine Co.*, 101 N. J. Eq. 554, 139 Atl. 50; *Morris v. American Public Utilities Co.*, 14 Del. Ch. 136, 122 Atl. 696; *Keller v. Wilson & Co.*, 14 Del. App. Ch. 391, 190 Atl. 115; *Consolidated Film Industries v. Johnson*, 15 Del. App. Ch. 407, 197 Atl. 489; *Havender v. Federal United Corp.*, 23 Del. Ch. 104, 2 A. (2d) 143; *Patterson v. Durham Hosiery Mills*, 214 N. C. 806, 200 S. E. 906; *Harbine v. Dayton Malleable Iron Co.*, 61 Ohio App. 1, 22 N. E. (2d) 281; in which it was held that there was no power or authority to cancel the right to receive accumulated dividends accrued on preferred shares through passage of time but not declared or paid, by any alteration or rearrangement of the relationship between different classes of stockholders *inter sese*. These were, for the most part, injunction proceedings to prevent mergers or consolidations, the issuance of new stock, or other actions which threatened the rights of such preferred stockholders. As the court said in the *Lonsdale Securities Corporation* case, *supra*, "The bills were promptly filed before any change had taken place in the circumstances of the company or others."

If we assume, despite the different constitutional and statutory provisions which were discussed at length in those cases, that they state the law applicable to such a situation in this state, the appellants have given the answer to their argument that the necessary changes could have been made in the capital structure of the old company and that it was unnecessary to dissolve it and transfer its assets to a new corporation. A reorganization that would interest any new capital was impossible so long as it was necessary to make up an eight hundred thousand dollar capital impairment and pay off two million dollars in cumulative

accrued dividends on preferred stock before any dividends could be paid to new investors.

This line of cases dealing with *inter sese* relationships between different classes of stockholders in the same corporation has no application to the present case; and they are certainly not supporting authority, in any event, for the right to maintain an action to recover the face value of preferred stock and accumulated dividends. In fact, the case of *Havender v. Federal United Corp., supra*, was reversed, and the preferred stockholders were denied any relief because of their laches. *Federal United Corp. v. Havender*, 17 Del. App. Ch. 318, 11 A. (2d) 331. We have heretofore quoted from that opinion.

The only two cases cited as supporting this proposition which actually involved an attempt to secure a present money judgment are *Roberts v. Roberts-Wicks Co.*, 184 N. Y. 257, 77 N. E. 13, 112 Am. St. 607, 3 L. R. A. (N.S.) 1034, and *Buck v. Kleiber Motor Co.*, 97 F. (2d) 557, both of which are readily distinguishable. In the former, the payment of the accumulated dividends out of surplus profits was directed to be made before any dividend was paid on common stock. The case *sub judice* is, of course, not a suit by preferred stockholders for payment out of surplus profits but is a suit by preferred stockholders of a corporation that never had any surplus profits, for the amount of their stock and accumulated dividends payable forthwith. In *Buck v. Kleiber Motor Co., supra*, the assets of the Kleiber Truck Company, an Arizona corporation, had been transferred to the Kleiber Motor Company, a Nevada corporation, in 1926. It was admitted that the transaction was not authorized by either the truck company's articles of incorporation or the Arizona law. The preferred stockholders who maintained the action had protested at a stockholders' meeting and refused to exchange their preferred stock in the truck company for common stock of the motor company. The actual dissolution of the truck company occurred in 1934 and the dissident preferred stockholders began their action in 1936. Without discussion, the circuit court of

appeals of the ninth circuit held that any action to rescind the transaction and restore the assets to the truck company was barred by limitations and laches.

In the *Kleiber Motor Company* case, the new company, in taking over the assets of the old company, agreed to assume its liabilities; and the court held that the holders of the preferred stock of the truck company might sue on the promise of the motor company to assume the liabilities of the truck company. The distinction between that case and the present is that the motor company had agreed that the liabilities assumed by it included the obligations of the truck company to its preferred stockholders, whereas in the present case the new company had taken the assets of the old "subject to its outstanding indebtedness." Under all of the authorities, the rights of the preferred stockholders to their accumulated dividends under the situation here existing did not constitute an indebtedness; in fact, the primary purpose of the creation of the new company in the present case was to wipe out the old company's responsibilities to its preferred stockholders for accumulated dividends, which amounted to at least double the value, in 1938, of its entire assets.

In an extensive but concededly not exhaustive investigation, we have found only one suggestion of such compensation as that being urged by appellants as being available, where there was no surplus from which accumulated dividends could be paid, and that was in the case of *Windhurst v. Central Leather Co.*, 105 N. J. Eq. 621, 149 Atl. 36. In that case, after the court of chancery had held that the preferred stockholders of one or two merged corporations were barred by their laches from maintaining an action to prevent the consolidation and merger of the companies (see *Windhurst v. Central Leather Co.*, 101 N. J. Eq. 543, 138 Atl. 772), the pleadings were amended

" . . . so as to include a prayer that in the event the injunction was denied, then that the contract created by the purchase by the complainants of their preferred stock should be specifically enforced and that the defendant Central Leather Company should be decreed to pay to each com-

plainant the par value of his respective shares of such stock together with arrears of dividends, amounting to $42 for each share." *Windhurst v. Central Leather Co.,* 105 N. J. Eq. 621, 149 Atl. 36.

This prayer for relief was predicated on the rights of the preferred stockholders in the event of dissolution, which were set forth in the certificate of incorporation and inserted in the certificates of preferred stock, *i. e.*:

" 'In case of a liquidation or dissolution or winding up [whether voluntary or involuntary] of the corporation, the holders of the preferred stock shall receive cash to the amount of the par value of such preferred stock, together with all accrued and unpaid dividends thereon [but no more] before any payment is made to the holders of the common stock.' " *Windhurst v. Central Leather Co.,* 107 N. J. Eq. 528, 153 Atl. 402.

The court of chancery and the court of error and appeals held that a merger was not a dissolution, and that the claim to be paid par and accumulated dividends for their preferred stock was baseless. *Windhurst v. Central Leather Co.,* 105 N. J. Eq. 621, 149 Atl. 36; 107 N. J. Eq. 528, 153 Atl. 402.

It is to be noted that the provision in the by-laws here pleaded by appellants relative to rights of preferred stockholders on dissolution, *i. e.*,

"The preferred stock shall be paid out of the assets of the company in case of dissolution before anything is paid upon the common stock,"

is by no means as explicit as in the *Windhurst* case with reference to the right to receive "accrued and unpaid dividends" in the event of dissolution.

This contention of appellants as to what they are entitled to receive on the dissolution of the old company was no part of their prayer for relief, and no part of the theory of the case which they presented to the trial court (at least so far as the record before us is concerned). They have cited no authority which supports it. We decline, on the present record, to pass upon what appellants' legal rights as dissident preferred stockholders may be. As the supreme court of Missouri said in *Tanner v. Lindell R. Co.,* 180 Mo. 1, 79 S. W. 155, 103 Am. St. 534:

"The court can not, out of the materials at hand, construct a case for them different from that made by themselves, for the purpose of affording them some relief, which they do not ask."

Because of the laches of the appellants, the judgment of dismissal is affirmed.

MALLERY, C. J., MILLARD, and SCHWELLENBACH, JJ., concur.

SIMPSON, J., concurs in the result.