**Kenneth D. MOORE et al., Appellants,**

v.

**STATE of Alaska et al., Appellees.**

**STANDARD OIL COMPANY OF CALIFORNIA, Cross-Appellant,**

v.

**Kenneth D. MOORE et al., Cross-Appellees.**

**Nos. 2551, 2587.**

Supreme Court of Alaska.

July 9, 1976.

---

**23.** Our holding makes it unnecessary to discuss any of the other arguments advanced in this appeal.

Warren W. Matthews, Jr., and David Shimek of Matthews, Dunn & Baily, Anchorage, for appellants and cross-appellees.

Avrum M. Gross, Atty. Gen., Juneau, and James N. Reeves, Asst. Atty. Gen., for appellee, State of Alaska.

Clifford J. Groh of Groh, Benkert & Walter, Anchorage, for appellee, Call.

Thomas P. Owens, Jr., of Owens, Davis & Bartlett, Anchorage, for appellees, Simasko Production and Phillip Rahoi.

Robert L. Hartig of Cole, Hartig, Rhodes, Norman, Mahoney, & Goltz, An-

chorage, for appellee, Texas Intern. Petroleum Corp.

Robert L. Eastaugh and Eugene F. Wiles of Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, for appellee, Standard Oil Co. of Cal.

Joseph Rudd of Ely, Guess & Rudd, Anchorage, for appellee, Shell Oil Co.

Donald Burr of Burr, Pease & Kurtz, Anchorage, for appellee, Union Oil Co. of Cal.

Douglas Pope, Anchorage, as amicus curiae for Betty Lee Smith, Charlene Huntley and Claire Lotspeich.

Before RABINOWITZ, CONNOR, ERWIN and BURKE, JJ., and DIMOND, J. Pro Tem.

## OPINION

CONNOR, Justice.

This lawsuit concerns the legality of the sale of certain offshore oil and gas leases located in the vicinity of Kachemak Bay. Kachemak Bay is a highly productive marine environment, and a number of commercially valuable species of fish and shellfish inhabit the area. The sale in question was denominated the "28th Competitive Oil and Gas Lease Sale," and was conducted by the Division of Lands of the Department of Natural Resources of the State of Alaska on December 13, 1973. Plaintiffs sued to set aside the sale of the leases. The issuance of those leases is a prerequisite to the development of oil and gas resources in the Kachemak Bay area. Six of the plaintiffs are commercial fishermen residing in Homer and Seldovia; the seventh, McBride, owns and operates a lodge on Kachemak Bay. Plaintiffs believe their livelihood will be threatened if oil exploration and production occur in the waters in which they fish. The defendants are the State of Alaska and the lessees of the tracts in or near the bay which were leased at the sale.

This appeal was taken by plaintiffs from an order entered by Superior Court Judge Thomas E. Schulz, May 20, 1975, dismissing plaintiffs' amended complaint and granting the defendants' motions for summary judgment. Although the defendants had moved for summary judgment on a number of grounds, the trial court's grant of summary judgment was based solely on the issue of laches.

In their complaint, as amended, plaintiffs alleged that the lease sale was unlawful for three reasons: 1) state officials did not comply with certain notice provisions; 2) state officials did not make a reasoned finding that the sale would serve the best interests of the state; and, 3) state officials did not comply with AS 38.05.305 requiring joint study and review with local authorized planning agencies prior to the sale. The defendants denied plaintiffs' allegations, and urged, in addition, several affirmative defenses, one of which was laches. Plaintiffs and defendants then filed cross-motions for summary judgment based on the aforementioned grounds.

The record indicates that the history of events leading to the sale of the leases and the initiation of this lawsuit is basically as follows. On April 13, 1972, a press release from the governor's office announcing the proposed sale of oil and gas leases in Kachemak Bay was published. Following this announcement, citizens of Homer, including a representative of the Homer Chamber of Commerce, expressed their concern over the proposed sale to state officials. These individuals were reassured by the state officials that any plans to sell leases located in the vicinity of Kachemak Bay were indefinite, that industry interest in the area was slight, and that competing uses and environmental considerations would be taken into account before any leases were sold.

On July 13, 1973, the call for nominations was issued to the oil industry. The call for nominations represents the state's request for expressions of industry interest in the sale. Nominations of particular tracts are made by the oil companies and indicate their opinions as to which tracts

should be leased; they are confidential. The nominating period closed September 4, 1973.

On September 18, 1973, based on the information received from the nominations of the oil companies, the Chief of the Minerals Section of the Division of Lands, Pedro Denton, sent a recommendation to the Commissioner of Natural Resources, Charles Herbert, to include large portions of the Kachemak Bay area in the sale. On October 19, 1973, Herbert gave his approval of the sale per Denton's recommendation. In November of 1973, the Division of Lands proceeded to issue formal notice of the sale. On December 5, 1973, a petition requesting a public hearing signed by about 300 residents of the Kachemak Bay area was received by the Division of Lands. The request was denied. The sale was held December 13, 1973, and the leases were issued in January of 1974.

## I.

In its memorandum of decision dated May 14, 1975, the trial court held that plaintiffs' claims were barred by the defense of laches, and their suit was consequently dismissed. Since this case arose on summary judgment, we must determine whether there were any genuine issues of material fact, and whether the moving parties were entitled to judgment as a matter of law.[1] Examination of the record does not reveal that there were genuine issues of material fact before the court with respect to the issue of laches. We now turn to a review of the legal questions presented to determine whether the court below erred in ruling that defendants were entitled to

1. Alaska R.Civ.P. 56(c).

2. See *Gardner v. Panama Ry.*, 342 U.S. 29, 30–31, 72 S.Ct. 12, 96 L.Ed. 31 (1951).

3. This is the same test we apply in determining whether a trial judge's findings are clearly erroneous. See *Sanuita v. Hedberg*, 404 P.2d 647, 650 n. 6 (Alaska 1965). While clear error cannot be demonstrated by merely showing a conflict in the evidence, *Preferred General Agency, Inc. v. Raffetto*, 391 P.2d 951, 953 (Alaska 1964), and we will not reweigh conflicting evidence, *id.* at 952, the

assert the laches defense as a matter of law.

The decision to sustain a defense based on laches is properly addressed to the discretion of the trial court,[2] and will not be overturned unless we feel a definite and firm conviction that a mistake has been committed.[3] *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 457 (Alaska 1974).

In *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough, supra,* we set forth those elements which are crucial to a finding of laches. We stated:

"The doctrine creates an equitable defense when a party delays asserting a claim for an unconscionable period. A court must find both an *unreasonable delay* in seeking relief and *resulting prejudice* to the defendant. Sustaining this defense requires a decision by the trial court that the equities of the case justify refusal to hear and decide a party's claim. . . .

No specific time must elapse before the defense of laches can be raised because *the propriety of refusing to hear a claim turns as much upon the gravity of the prejudice suffered by the defendant as the length of a plaintiff's delay.*" 527 P.2d at 457 (emphasis added) (footnote omitted)

Thus there are two independent criteria which must be met before the equitable doctrine of laches can be applied. The defendant must show the plaintiff was guilty of inexcusable delay, resulting in undue prejudice to the defendant.

existence of conflicts in evidence which give rise to genuine issues of material fact is adequate ground for reversal of a grant of summary judgment. See *Braund, Inc. v. White*, 486 P.2d 50, 53–54 (Alaska 1971). Our holding is based on what we believe are undisputed facts. While the trial court's opinion indicates it may have attempted to resolve certain factual disputes below, we find that it merely misconceived the facts relating to those disputes and that the material facts relating to those issues were in reality not in conflict.

The element of delay has been described as a "lack of diligence"[4] and "neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence."[5] The plaintiffs argue that the trial court erred in finding that they were guilty of such delay or neglect. Plaintiffs point out that the filing of their suit, in early December of 1974, closely followed the issuance of the first permits allowing commencement of actual oil exploration activities in Kachemak Bay. For example, the first permit authorizing a lessee to drill was issued to Shell Oil Company on November 12, 1974, approximately three weeks prior to the initiation of plaintiffs' suit.[6] Thus plaintiffs contend that they acted promptly once their usufructuary rights in the waters of Kachemak Bay were actually endangered. In reviewing all the facts and circumstances of this case, we must agree that plaintiffs were not guilty of such inexcusable delay as to bar them from asserting their claims. Moreover, sufficient prejudice has not been established on the record and, therefore, we do not believe the equitable doctrine of laches should apply.

The point in time at which plaintiffs must exercise their remedies in court or lose their right to assert their cause of action depends on the facts and equitable considerations of each case, including the knowledge of the plaintiffs, the conduct of the defendants, the interests to be vindicated, and the resulting prejudice. Defendants urge us to look to the time at or near the lease sale as the crucial date from which to measure plaintiffs' delay. They assert that it is the appropriate point in time since it was the alleged irregularities of the sale itself that formed the basis of the suit below. We cannot agree; for, in determining when laches should be applied, our concern is not so much with when the alleged wrong occurred, as it is with when, in light of any resulting prejudice to defendants, it became reasonable to expect plaintiffs to act upon the wrong. It is from the latter point onward that the plaintiffs' time begins to run. Thus in *Steubing v. Brinegar*, 511 F.2d 489 (2d Cir. 1975), a case similar to the one at bar, the Second Circuit did not measure plaintiffs' delay from the time when the wrong which was the basis for the plaintiffs' suit occurred. Instead, the Court of Appeals looked to that point in time when plaintiffs, as laymen challenging administrative action, would most likely have been galvanized into action and motivated to hire counsel.[7] It noted that plaintiffs had a right to assume that federal officials would comply with the applicable law.[8] We are in agreement with the analysis of the Court of Appeals. One of the factors we

---

4. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

5. *Arnold v. Melani*, 75 Wash.2d 143, 449 P.2d 800, 803 (1968), *modified*, 450 P.2d 815 (1969) (dissenting opinion); *Hanns v. Hanns*, 246 Or. 282, 423 P.2d 499, 511 (Or. 1967).

6. In November of 1974, Shell Oil Company also received approval of its "plan of operations" from the State Division of Lands, and a location permit was granted it by the Army Corps of Engineers. A draft E.P.A. discharge permit which would authorize the discharge of cooling waters, deck drains and sewage from an oil drilling platform (The George Ferris) did not go on record with notice to the public until February 28, 1975.

7. 511 F.2d at 495. In *Steubing*, defendants appealed from the entry of a preliminary injunction enjoining construction of a federally-funded expressway bridge over Lake Chautauqua in New York pending preparation and filing of an Environmental Impact Statement, pursuant to the National Environmental Policy Act. They contended that the issuance of the injunction pending compliance was improper because plaintiffs delayed in bringing the action, because the bridge and adjacent highway sections were allegedly at advanced stages of planning or construction with substantial sums having been spent thereon, and because delay would result in substantially increased costs. *Id.* at 491–92.

8. *Id.* at 495; *accord, I–291 Why? Ass'n v. Burns*, 372 F.Supp. 223, 236–37 (D.Conn. 1974); *Clark v. Volpe*, 342 F.Supp. 1324, 1328–29 (E.D.La.), *aff'd*, 461 F.2d 1266 (5th Cir. 1972).

will consider in measuring the plaintiffs' delay is when, under the circumstances, it became no longer reasonable for plaintiffs to assume that defendants would comply with the law. We will also look to that point in time when there were positive steps taken by defendants which made their course of conduct irrevocable, and would have galvanized reasonable plaintiffs into seeking a lawyer.

■ Defendants maintain, in addition, that plaintiffs should be held accountable for not filing suit to set aside the leases from the time they first learned of the sale itself. Since some of the plaintiffs knew of the lease sale before it occurred,[9] defendants argue that suit should have been brought prior to the sale. However, the record shows that of the six plaintiffs deposed, one learned of the sale only after it had taken place, one heard only talk and "rumor" prior to the sale, and the remaining four only learned of it within a three week period prior to the event. The knowledge of some of the plaintiffs cannot be imputed to others. Moreover, it is hardly reasonable to expect the plaintiffs

who did know of the pending sale to have not only recognized that they had a cause of action,[10] but to have also hired counsel and filed suit in the days preceding the sale.[11] In *Steubing v. Brinegar, supra,* the court acknowledged that the plaintiffs were long aware of the pending project, and that more than a year before they brought suit they were aware or should have been aware that buildings were being demolished in contemplation of construction of the project which was enjoined.[12] Nevertheless, the court chose to measure the plaintiffs' delay from the time preparations for the project "began in earnest," with the stripping of land, removal of trees, dredging, construction of the first test piling, etc. The Second Circuit explained that it was not until such "positive developments" had occurred that one could usually expect opposition to a project of that sort to be galvanized to the extent the parties would go out and hire counsel.

■ Utilizing the criteria enunciated above, we do not find that plaintiffs in the instant case delayed unreasonably. Not until the first drilling permit was issued

---

9. The trial judge erroneously found in his memorandum of decision that plaintiffs knew of the inclusion of Kachemak Bay "some months" prior to the sale. While we are not bound by the judge's findings on summary judgment, and can look behind them to see if his ultimate judgment is supported by the record, such errors indicate the judge may have been mistaken in his overall assessment of the case. *Cf. Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough,* 527 P.2d 447, 456–57 & n. 26 (Alaska 1974); Alaska R.Civ.P. 52(a).

10. Defendants' arguments to the effect that plaintiffs possessed, near the time of the sale, actual knowledge of the possible legal remedies they might have pursued to stop or set aside the sale are not convincing. If it can be said that plaintiffs had knowledge of their remedies near the time of the sale, it was only to the extent that a general sentiment existed among some of them that something should be done to make the state agencies which were responsible for the lease sale accountable to the citizens of Homer, and a lawsuit might be one way to accomplish that goal; the record does not reveal that they

knew of any grounds upon which a suit could be filed. Knowledge of the lease sale itself does not imply knowledge of administrative irregularities which might give rise to a cause of action. *See I–291 Why? Ass'n v. Burns,* 372 F.Supp. 223, 239 (D.Conn. 1974). *But see Baskin v. Tennessee Valley Authority,* 382 F.Supp. 641, 646 (M.D.Tenn. 1974). The trial judge's finding that plaintiffs knew or should have known of some of the alleged irregularities prior to the sale of the leases was erroneous.

11. Defendants also contend that even if all the plaintiffs did not have actual knowledge of the sale prior to its occurrence, they were put on constructive notice of it by the notice which was published in the Anchorage Times and therefore should have sued prior to the sale. The sufficiency of notice of the sale by publication is, of course, one of the issues raised in plaintiffs' pleadings on the merits. Even though the notice by publication was in fact legally sufficient, its relevance to the resolution of the laches question is marginal, especially where the notice was published only a few weeks before the sale was held.

12. 511 F.2d at 495.

were plaintiffs affirmatively on notice that, barring litigation, development of petroleum resources in Kachemak Bay would proceed as planned.[13] Within a month following the issuance of that permit, plaintiffs' suit was filed. In our opinion, the issuance of the drilling permit marked the time at which defendants became so irrevocably committed to a course of action, which endangered the plaintiffs' interest, that plaintiffs reasonably could have been expected to seek legal remedies.

In so concluding, we recognize that it is no easy matter to mount an effective legal battle against a project of this magnitude and complexity. Often, the "mists of bureaucracy" remain impenetrable to the layman, and in cases such as these may tend to obscure the true posture of the defendant agencies. Moreover, as we noted before, plaintiffs had the right to presume defendants would proceed in accordance with the law. Before we will hold plaintiffs guilty of neglectful delay sufficient for laches, we will accord them a reasonable amount of time in which to ascertain the existence of administrative irregularities and the scope of defendants' commitment.

■ One factor we have considered is the history of assurances made before the sale by state officials to many citizens of Homer. The assurances were to the effect that, although the sale was to be held, there was no immediate cause for concern because 1) it was uncertain that sufficiently large bids would be received for tracts in Kachemak Bay to be leased; 2) the issuance of leases did not mean development would take place; and, 3) no one knew if drilling would actually be allowed in the bay. The trial court found that such assurances were made "time and time again." Furthermore, they were made to at least one individual who later worked with plaintiffs in organizing their lawsuit. The assurances underplayed the importance of the lease sale itself to the citizens of the Homer area, giving them a false sense of security.

■ Following the sale plaintiffs, members of their families, and organizations to which they belonged continued to protest the sale. They attended legislative and administrative hearings, where they aired their views and offered evidence on the relative merits of oil development in Kachemak Bay. Even the good faith pursuit of alternative remedies may not justify what is otherwise unreasonable delay resulting in undue prejudice to defendants. However, the record of the instant case does not reveal what would otherwise constitute prejudicial delay. Moreover, the pursuit of alternative remedies was itself a reasonable course of action and was conducted in a reasonable fashion. Under the circumstances, we will not penalize plaintiffs too heavily for any delay resulting from attempts to reach a more amicable resolution of the problem.[14]

---

13. Of course, the occurrence of such positive developments is relevant to the question of prejudice as well as the question of delay. The two elements of prejudice and delay are mentioned in any discussion of the doctrine of laches, as they are somewhat interdependent.

14. Defendants have cited *Landell v. Northern Pac. Ry.*, 122 F.Supp. 253, 254, 256 (D.D.C. 1954), *aff'd*, 96 U.S.App.D.C. 24, 223 F.2d 316 (1955), in support of their contention that the pursuit of alternative remedies will not excuse laches. However, in that case, plaintiffs, who were minority shareholders in a reorganized corporation and were contesting the validity of the transfer of the corporate assets to the defendant, had delayed in suing for over fifty years. They had pursued alternative remedies, with unproductive results, over that entire period. Laches decisions are arrived at by a balancing of all the factors present in a particular case. When such an overwhelming factor as a fifty year delay militates in favor of applying laches, the court's dismissal of some of plaintiffs' other theories is hardly surprising.

*Stewart v. Johnston*, 30 Wash.2d 925, 195 P.2d 119, 127 (1948), and *Centerview/Glen Avalon Homeowners Ass'n. v. Brinegar*, 367 F.Supp. 633, 639 (C.D.Cal.1973), have also been cited by defendants on this point. Like *Landell*, these cases present situations where the courts would, in any case, be much more

In determining whether laches was properly applied in the case at bar, we cannot overlook the fact that under Section 1 of Article VIII of our constitution, the public also has an interest in the proper development of Alaska's resources.[15] While we cannot agree with plaintiffs' assertion that laches should never be applied when the "public interest" is at stake, neither do we accept defendants' contention that the public interest status of a case is irrelevant to whether laches should be applied. Instead, we choose to weigh the importance of the public interests in question, and the difficulties and merits of bringing a case of this type to court, as a part of the overall process of balancing the equities of a particular case to determine whether plaintiffs are guilty of inequitable delay.[16]

Finally, we must consider the element of prejudice. We do not find that plaintiffs' delay in filing suit has sufficiently prejudiced defendants to justify barring plaintiffs' suit. The oil company defendants have alleged that the disclosure of certain information at the lease sale will injure their respective competitive positions if they are forced to submit new bids for the same tracts in the future. They also maintain that the information was acquired at great expense. At the sale, the bids of the various lessees were opened and made public. It is the defendants' position that both the bidding process and the nomination process, the results of which remained confidential until the date of the sale, effectively required bidders to disclose their best estimate of the likelihood of successful oil exploration on the particular lease sites bid upon. The trial judge described the information as "proprietary information." Defendants argue that if plaintiffs had promptly brought an action to enjoin the sale, the release of the information would have been prevented, and they would have been spared the consequent prejudice.

We fail to understand how defendants can ascribe such prejudice to plaintiffs' "lack of diligence".[17] Plaintiffs only learned of the sale in the two or three weeks preceding it. As we noted previously, their failure to file suit immediately for injunctive relief was not unreasonable. Obviously, once the sale date had passed, the injury to defendants which resulted from the release of their bidding information became no greater because of any subsequent delay on the part of plaintiffs. Moreover, the expenditures made to procure the information must have occurred many months before the sale. Speculative expenditures of this type cannot be ascribed to plaintiffs' delay in filing suit.

---

likely to entertain a defense based on laches than does the case at bar. Moreover, the plaintiffs in the case at bar have protested more vehemently, and more directly, than the plaintiffs did in the foregoing cases.

Finally, not all courts considering laches claims have held it against plaintiffs that they delayed filing suit while pursuing less drastic means. *See, e. g., Minnesota Public Interest Research Group v. Butz,* 358 F. Supp. 584, 620 (D.Minn.1973) (plaintiff's reliance on government's assurances found "justified and reasonable").

15. *See Alyeska Ski Corp. v. Holdsworth,* 426 P.2d 1006, 1011 (Alaska 1967). *See also* AS 16.20.220–.270, which provides for the creation of critical habitat areas. Kachemak Bay was designated such an area in 1974. § 2 Ch. 117 SLA 1974. The designation represents an expression of legislative policy concerning the importance of the particular resources of Kachemak Bay.

16. *See Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 868 (5th Cir. 1975); *Steubing v. Brinegar,* 511 F.2d 489, 495 (2d Cir. 1975); *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F. 2d 1164, 1182–83 (6th Cir. 1972); *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1329–30 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L. Ed.2d 261 (1972); *I–291 Why? Ass'n v. Burns,* 372 F.Supp. 223, 237–39 (D.Conn. 1974).

17. *Lathan v. Brinegar,* 506 F.2d 677, 692 (9th Cir. 1974); *Lathan v. Volpe,* 455 F.2d 1111, 1122 (9th Cir. 1971); *Iowa Student Public Interest Research Group (ISPIRG) v. Callaway,* 379 F.Supp. 714, 720 (S.D.Iowa 1974).

Defendant Shell Oil Company claims that it suffered additional prejudice, because of action it took in reliance upon the lease sale. Following the lease sale, it applied for four permits in order to begin exploration activity on its tracts in 1975. It signed a contract in late June of 1974 for the services of a drilling vessel and had it brought to Alaska. It also entered into some contracts for supplemental services such as helicopter services, warehouse and storage space, mobile office space, etc. Most, if not all, of these contracts were entered into before plaintiffs filed suit.

The seeking of the permits alone cannot constitute the kind of serious prejudice required to justify the imposition of laches. As for the contract for the drilling vessel, it appears that Shell was not planning to use it at least until 1975, after another oil company had finished using it in another location in Alaska. When the drilling rig was finally moved to Kachemak Bay in 1975, Shell was unable to commence drilling operations because the rig had suffered a mechanical breakdown. The costs incurred in contracting for the drilling vessel may have been substantial. But we do not see how they are attributable to plaintiffs when another oil company was using the drilling vessel the entire time of plaintiffs' alleged delay. The other contracts are not of sufficient magnitude to justify imposition of laches, especially where the interests at stake are so important. Most important, Shell entered into these contracts and activities, for the most part, prior to November of 1974, and we have concluded

that November 1974 is the proper time from which to measure plaintiffs' delay.

The state claims that it spent a great deal of money in preparing for the sale. However, such expenditures cannot be attributed to plaintiffs' delay. The state's argument that the money received from the sale has already been budgeted and appropriated is also unpersuasive. In the case at bar, plaintiffs are not trying to halt a project on which large amounts of state funds have already been spent.[18] Moreover, as protector of our resources,[19] the state can hardly argue that it would be inconvenient to return the funds to the oil companies if the sale were set aside because the state acted improperly. Finally, there is no evidence those funds were actually budgeted and appropriated.

Considering the importance of the public interests at stake, the lack of serious prejudice to defendants as the result of plaintiffs' delay, the efforts of plaintiffs to secure more amicable means of relief, and the conduct of the defendant state, we cannot agree with the trial judge that prosecution of plaintiffs' claim would be inequitable.

II.

The trial judge dismissed the plaintiffs' action solely on the basis of laches, and did not reach the other questions which were presented on the cross-motions for summary judgment. However, defendants have urged us to consider these questions if we find that the trial court erred in granting summary judgment on

---

18. A number of courts which have faced the question of laches in the context of environmental litigation have looked to the degree of completion of the contested project as an important element in determining the extent of the defendant's prejudice. *See, e. g., Smith v. Schlesinger*, 371 F.Supp. 559, 561 (C.D.Cal. 1974) (applied laches where project was 35%–40% complete) ; *Iowa Student Public Interest Research Group (ISPIRG) v. Callaway*, 379 F.Supp. 714, 717, 721 (S.D.Iowa 1974) (applied laches where dam project was 66% complete) ; *Clark v. Volpe*, 342

F.Supp. 1324, 1327, 1329 (E.D.La.), *aff'd*, 461 F.2d 1266 (5th Cir. 1972) (applied laches where highway 25%–30% complete) ; *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 868–69 (5th Cir. 1975) (declined to invoke laches where bids had been let, but project itself barely started, distinguishing *Clark supra*, on these grounds).

19. *Cf. Metlakatla Indian Community, Annette Island Reserve v. Egan*, 362 P.2d 901, 915 (Alaska 1961).

the basis of laches. Under *Ransom v. Haner*, 263 P.2d 282, 285 (Alaska 1961), we can affirm a trial court's grant of summary judgment, if alternative grounds exist for upholding the judgment below. Since we have decided that the trial court erred in granting summary judgment on laches, we now turn to the other arguments presented to the trial court on the cross-motions for summary judgment to see if grounds exist for upholding its judgment. The issues we must consider include the claims advanced by plaintiffs below, comprising the merits of their case.

### III.

The first such question we will consider is whether the Division of Lands complied with legal requirements concerning the publication of notice. Plaintiffs asserted below that the sale was invalid on the ground that the publication of notice of the sale in the Anchorage Times and the Kenai Cheechako News failed to satisfy the relevant constitutional and statutory mandates. As noted above the trial court did not rule on the issue.

Article VIII, § 10, of the Alaska Constitution provides:

"No disposals or leases of state lands, or interests therein, shall be made without prior notice and other safeguards of the public interest as may be prescribed by law."

Pursuant to this constitutional provision, the legislature enacted the Alaska Land Act, the provisions of which are now found in AS 38.05.005–.370. AS 38.05.345 provides in pertinent part:

"(a) Public notice of a sale, lease or disposal of land or interest in it, except grants under § 330 of this chapter and preference right grazing leases under §§ 75 and 80 of this chapter, when required, shall be substantially as follows.

(b) Notice shall be published once a week for three consecutive weeks preceding the time of sale stated in the notice, in at least *one newspaper of general circulation in the vicinity* in which the land, property or interest in it is to be sold, leased, or disposed of. Where there is no newspaper of general circulation in the vicinity, notices shall be posted in three public places near the land to be sold, leased, or otherwise disposed of. . . ." (Emphasis added)

The notice was published in the Kenai Cheechako News. However, the last publication in that paper was less than a week prior to the sale. Hence, there was not sufficient notice pursuant to AS 38.05.-345. Publication in the Anchorage Times, on the other hand, occurred within the proper time frame as set forth in the statute.

Thus we turn to the question of whether the Anchorage Times is a "newspaper of general circulation" in the vicinity of Kachemak Bay. Our threshold determination is how the phrase "general circulation" shall be construed. The proper construction of the term "general circulation" requires consideration of both the qualitative and quantitative aspects of the publication. A newspaper which contains news of general interest to the community and reaches a diverse readership is one of general circulation.[20] In view of the fact that the Anchorage Times carries news on a variety of subjects of general interest to the average reader, only a lack of readers in the Homer area could deny it the status of a "newspaper of general circulation in the vicinity" of the lands offered for lease.

At the time the notice was published, the population of the Homer area was approximately 3,500. The circulation of the Anchorage Times in the area was approximately 130. The number of read-

20. *See State ex rel. Bowler v. Board of County Comm'rs*, 106 Mont. 251, 76 P.2d 648, 652 (1938) ; *Hesler v. Coldron*, 29 Okl. 216, 116 P. 787 (1911) ; *Baldwin v. Brown*, 193 Cal. 345, 224 P. 462, 465 (1924) ; *Shulansky v. Michaels*, 14 Ariz.App. 402, 484 P.2d 14, 16–17 (1971).

ers, albeit small,[21] was not so insignificant that the newspaper would fail to reach a diverse group of people in the community. Therefore, it must be said that the Anchorage Times was a newspaper of "general circulation" in the Homer area.

The foregoing determination precludes plaintiffs from successfully arguing that the Division of Lands failed to give adequate notice of the 28th Competitive Oil and Gas Sale as required by AS 38.05.345.

### IV.

Plaintiffs' second claim on the merits was that the sale was unlawful because it was not preceded by a reasoned finding made by the Director of the Division of Lands that the sale would best serve the interests of the state.

AS 38.05.035(a)(14) provides:

"The director shall . . .

(14) when he finds that the interests of the state will be best served, he may, with the consent of the commissioner, approve contracts for the sale, lease, or other disposal of available lands, resources, property or interest in them. . . ."

A majority of this court believes that no formal, written finding is necessary under this statutory language. However, a majority of the court also believes that the determination of the director should be judicially reviewable.[22] Accordingly, this case must be remanded to the superior court for appropriate further proceedings on this question.[23]

---

21. The plaintiffs contend that this small percentage of readership mandates a finding that the Anchorage Times does not comply with the statutory requirements. However, *Times Printing Co. v. Star Publishing Co.*, 51 Wash. 667, 99 P. 1040, 1041–43 (1909), is distinguishable. Indeed, a statistical analysis for the issue at hand would be most inappropriate because size of readership is only one factor which must be considered in determining whether a particular newspaper is one of general circulation.

22. This subject is treated in the separate opinion filed herein by Justice Rabinowitz.

23. I must dissent from the court's remand of this case.

I find nothing in this statute requiring a public hearing or formal written finding in order to determine that state lands shall be leased. I am not unmindful of the dangers in assuming that a general award or finding implies a finding of all the specific facts needed to support it. However,

"Implying ultimate findings from the action taken is quite different. If a statute provides that the agency shall grant the certificate if it finds that the grant is in the public interest, and if the agency grants the certificate without saying anything about the public interest, good sense requires that the reviewing court should imply the ultimate finding of public interest. The courts usually so hold." 2 K. Davis, Administrative Law Treatise § 16.07, at 456 (1958).

Here, the statute makes no mention of a formal, written "finding." It merely says that when the director "finds" it to be in

the best interests of the state, he may issue leases. The statute could, to the same effect, have read "when the director believes" or "when the director is of the opinion" that the state's interest is best served, he may lease the lands.

The statutory language is permissive in character: "may . . . approve contracts." The state is here engaged in the conduct of public proprietary business rather than the regulation of private enterprise. 1 F. Cooper, State Administrative Law 90 (1965). This convinces me that the decision of whether to lease or not to lease is committed to agency discretion. Moreover, that discretion is exercised in the formulation of public policy on the basis of highly technical scientific and economic information which we are poorly equipped to appraise. The problems presented are of the type which should properly be resolved by the legislative and executive branches of government. *Kelly v. Zamarello*, 486 P.2d 906, 913 (Alaska 1971).

In *Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1012 (Alaska 1967), we held that decisions of the Division of Lands concerning leases under the Alaska Land Act were judicially reviewable, and subject to the adjudicatory procedure review sections of the Alaska Administrative Procedure Act, specifically AS 44.62.560 and .570. I note that in both of the above cases the issue facing the court concerned persons who had been party to the administrative proceeding below. The case at bar, however, is brought by plaintiffs who had nothing to do with the administrative proceeding below; there

## V.

The next question presented is whether the lease sale is voidable because the Division of Lands did not study and review the leases with local planning agencies prior to the sale. Plaintiffs contend that the state failed to comply with AS 38.05.305, which requires in certain circumstances that the state consult with local planning agencies before selling or leasing state lands. They argue that under AS 38.05.305 joint study and review with the Kenai Peninsula Borough and the cities of Homer and Seldovia were required before the lease sale could be conducted by the state. Plaintiffs' argument with respect to AS 38.05.305 represents their third ground for contesting the validity of the lease sale.

Our threshold consideration is whether plaintiffs are entitled to obtain judicial review of the state's failure to consult with local agencies prior to holding the sale. In this regard, defendants urge us to deny review on the ground that plaintiffs, as individuals, have no standing to claim noncompliance with AS 38.05.305. Defendants submit that only an offended community or agency thereof could properly seek review of the state's alleged noncompliance with the statute in question. They argue that plaintiffs' interest in this matter is at best merely incidental or indirect, and, therefore, not sufficient to give plaintiffs standing.

As previous decisions of this court indicate, the concept of standing has been interpreted broadly in Alaska, favoring increased accessibility to judicial forums. In *Coghill v. Boucher*, 511 P.2d 1297, 1303 (Alaska 1973), we noted that "[i]n the past . . . this court has departed from a restrictive interpretation of the standing requirement."

▮▮▮ Whether a party has standing to obtain judicial resolution of a controversy depends on whether the party has a sufficient personal stake in the outcome of the controversy.[24] In our recent decision of *Wagstaff v. Superior Court, Family Division*, 535 P.2d 1220, 1225 (Alaska 1975), we described this requirement in terms of "injury-in-fact," and explained that its purpose is to assure the adversity which is fundamental to judicial proceedings.[25]

is nothing adjudicatory about the Division of Lands' action as it affects these plaintiffs. They are affected, rather, in much the same way the general public would be affected by any statute or regulation that is passed.

Furthermore, the basis of the *Holdsworth* decision was that the legislature would not be presumed to intend

"that this court was to be stripped of its constitutional obligation to insure that the administrative decision was in conformity with our laws." *See United States Smelting, R. & M. Co. v. Local Boundary Comm'n*, 489 P.2d 140, 142 (Alaska 1971); *See also Union Oil Co. v. State*, 526 P.2d 1357, 1365 n. 12. (Alaska 1974).

I would reaffirm our constitutional obligation, under Alaska Const. art. VIII, § 10, to ensure that the leasing of state lands and resources complies with the law. Should administrative decisions be completely capricious and arbitrary, or induced by corruption, I would have no difficulty in striking them down. But where, as here, they merely turn on the director's determination of the policy of the state in favoring the production of oil and gas as opposed to fishery and tourist resources, I cannot say that his determination violates any legal norm. To interfere is to inquire, without reliable criteria or standards, into an area in which the courts have no expertise.

24. *See Sierra Club v. Morton*, 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

25. *See Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Standing is an aspect of justiciability, whose origins have been the subject of much discussion. *See, e. g.,* Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?,* 78 Yale L.J. 816, 840 (1969); Comment, *Standing, Separation of Powers, and the Demise of the Public Citizen,* 24 Am.U.L.Rev. 835, 840 (1975). Not until 1968, did the United States Supreme Court explicitly hold that standing was a constitutional limitation on federal court jurisdiction, derived from the "case or controversy" requirement of Article III of the United States Constitution. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). However, the Court also pointed out that the doctrine of justiciability, of which standing is a part, is a blend of constitutional requirements and policy consider-

Plaintiffs in the case at bar maintain that they will be adversely affected if oil exploration and production are allowed to occur in Kachemak Bay. Since they are, for the most part, commercial fishermen, their livelihood is dependent upon the biological productivity of the bay. Thus they clearly possess a personal stake in the disposition of the resources of the bay, and stand to incur significant injury if such a disposition were allowed to occur without the benefit of a presentation of their competing interest in those resources. Presumably, AS 38.05.305 provides a possible avenue of expression for plaintiffs in their attempt to make sure the state comprehends the local effects of its actions.

Plaintiffs' interest in the outcome of the litigation is essentially economic. As such, it clearly meets the injury-in-fact require-ment for standing.[26] In *Wagstaff,* 535 P.2d at 1225, we stated:

> "It is clear that economic harm falls within those cognizable interests anticipated by the injury-in-fact doctrine." (Footnote omitted).

It does not concern us that AS 38.05.305 requires the state to consult with parties other than plaintiffs. Plaintiffs still have a stake in such a consultation, since § 305 provides a mechanism through which the state can arrive at a more informed disposition of the bay's resources. In *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 353–54 (Alaska 1971), we recognized economic injury to a competitor as a basis for standing, even though the plaintiff's primary interest was not in the direct outcome of the challenged administrative action. In that case, plaintiffs were malt li-

ations, which are not easily distinguished. *Id.* at 97, 88 S.Ct. 1942. In *Flast,* the Court explained that the case and controversy doctrine limits federal court jurisdiction by requiring that a "dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Id.* 392 U.S. at 101, 88 S.Ct. at 1953. The other aspect of that doctrine involves the concept of separation of powers. *Id.* at 95, 88 S.Ct. 1942. However, according to the Court, the separation of powers considerations of justiciability relate only to the substantive issues the litigant seeks to have adjudicated. Standing questions are limited to whether the litigant is a "proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Id.* 392 U.S. at 100–01, 88 S.Ct. at 1952. Thus, the federal constitutional requirements for standing concern the need for adversity and concreteness, but not the separation of powers. Moreover, the federal doctrine of standing is not only constitutional in origin, for in *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) the Court stated that "[a]part from Article III jurisdictional questions, problems of standing, as resolved by this Court, have involved a 'rule of self-restraint'."

The Alaska Constitution does not explicitly limit court jurisdiction to "cases" and "controversies," though we have recognized that the doctrine of separation of powers is im-plied within it. *Public Defender Agency v. Superior Court,* 534 P.2d 947, 950 (Alaska 1975). However, as the United States Supreme Court explained, *supra,* the only relevant inquiry in determining questions of standing is adversity, not separation of powers. Since the requirement of adversity has no constitutional base in Alaska, our requirement that it exist must be characterized as a judicial rule of self-restraint—as must the entire doctrine of standing itself. We adhere to this rule because the very nature of our judicial system renders it incapable of resolving abstract questions or of issuing advisory opinions which can be of any genuine value. The adversity requirement ensures that a question presented for our review is one that is appropriate for judicial determination. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L. Ed. 617 (1936). The adversity requirement is the basis for the injury-in-fact test which we have adopted.

26. Defendants' reliance·on *Jones v. Schultz,* No. 73–2790 (9th Cir. July 23, 1974) (summarized in 43 U.S.L.W. 3321), *cert. denied sub nom. Jones v. Simon,* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975), is misplaced. We do not find the stringent rules applied by federal courts to questions of taxpayer standing pertinent to our inquiry in the instant case. *See* 3 K. Davis, Administrative Law Treatise § 22.10 (1958). *See also Jefferson v. G.A.A.B.,* 451 P.2d 730, 732 (Alaska 1969).

quor wholesalers who sought review of the granting of an industrial tax credit to a brewery. Given the requisite stake in the outcome of the litigation, we do not find it determinative that a plaintiff would have played no part in the administrative procedure had administrative regularity been observed. Our concern in this matter is not so much with the substantive nature of the claims sought to be vindicated as with plaintiffs' interest in the ultimate resolution of those claims. Thus we hold that plaintiffs have standing to litigate the question of the state's compliance with AS 38.05.305.

 We now turn to the question of whether AS 38.05.305 applies to oil and gas leases such as those sold at the 28th Competitive Oil and Gas Lease Sale. AS 38.-05.305 provides:

> "Except for land disposed of under §§ 315–325 of this chapter, no land in or adjacent to an incorporated municipality or other organized community may be sold or leased, or a renewal lease issued, until the proposed use of the land has been studied and reviewed jointly by the director and local authorized planning agencies."

This provision is part of the Alaska Land Act,[27] which was enacted pursuant to Article VIII, § 10 of the Alaska Constitution.[28] In resolving the question before us, we must keep in mind the constitutional mandate, expressed in Article VIII, § 10, to safeguard the public's interest in the disposition of state natural resources. The joint study requirement as set forth in § 305 of the Alaska Land Act provides a means of safeguarding this interest. Accordingly, we will not lightly adopt a highly restrictive interpretation of the statute.

The general definition section of the Alaska Land Act provides the following definition of "lands":

> "Sec. 38.05.365. *Definitions.* . . .
> (16) 'state lands' or 'lands' means all lands, including shore, tide and submerged lands, or *resources* belonging to or acquired by the state;" (emphasis added).

Reading § 305 together with this section, on its face it seems that AS 38.05.305 should apply to lease sales such as the one contested by plaintiffs. Further analysis supports this interpretation.

We note that sections found throughout the Alaska Land Act utilized the word "land" in such a way that it could only be interpreted as encompassing resources within the scope of its meaning.[29] Admittedly, in certain provisions of the act the word "land" is used in a manner inconsistent with the statutory definition of the term.[30] However, instances of such inconsistencies are few in number, and bear no special contextual significance to AS 38.-05.305. Under the definition section of the act, statutory definitions are to apply "unless the context otherwise requires."[31] We find nothing about the context of AS 38.05.305 which would imply that the statutory definition of the word "land" should be disregarded.

 Nevertheless, defendants claim that under AS 38.05.145(a), only §§ 145–181 of the Alaska Land Act apply to min-

---

27. AS 38.05.005–.370.

28. *See State v. Aleut Corp.,* 541 P.2d 730, 736 n. 12 (Alaska 1975).

29. *See, e. g.,* AS 38.05.310. This section of the act provides for appraisals prior to the sale or lease of state lands, "except in the case of an oil or gas or mineral lease." Obviously, there would be no need to except oil, gas and mineral leases from the provisions otherwise applicable to "land" unless they were included within the category of "land". *See also* AS 38.05.135 for an ex-

ample of the use of the term "land" consistent with the statutory definition. That section is the "General" section of Article 6 which governs the "Leasing of Mineral Lands".

30. *See, e. g.,* AS 38.05.315 and AS 38.05.145 (a). However, despite the use of the word "land" in § 145(a), in § 145(b) the word "land" is used in a manner which clearly includes resources within the scope of the term.

31. AS 38.05.365.

eral lease sales. AS 38.05.145(a) provides in relevant part:

> "Deposits of . . . oil, gas . . . and state lands containing these deposits are subject to disposition under rules and regulations, recommended by the director and adopted by the commissioner, and the provisions of §§ 145–181 of this chapter. . . ."

We cannot accept this argument. Adoption of defendants' analysis would preclude application of crucial sections of the Alaska Land Act to oil and gas leases. For example, Article 12 (General Provisions), including the definitions section[32] of the statute, would not be applicable. Similarly, the § 035(a)(14) disposition powers of the Director under Article 1 (Administration) would be inapplicable to lease sales such as the one under consideration, as would the notice provisions of § 345.[33] Further, the legislature explicitly excluded oil and gas leases from the purview of AS 38.05.310. If no sections except §§ 145–181 apply to such leases, this language would be meaningless. We do not believe the legislature intended such a result.

■ Defendants point out that the state agencies involved have always taken the position that § 305 is not applicable to the sale of oil and gas leases. They urge us to defer to the enforcing agencies' construction of the statute in question. This we decline to do. In *State v. Aleut Corp.*, 541 P.2d 730 (Alaska 1975), the construction of § 305 was also at issue. In that case we rejected the Division of Lands' assertion that its long-standing interpretation of the statute should be deferred to, and refused to apply the reasonable basis standard of review to the agency's interpretation of § 305.[34] We explained that the reasonable basis test is applicable when an administrative agency's interpretation of law falls within that agency's particular area of expertise.[35] We went on to state:

> "The terms of AS 38.05.305 are not technical and mere familiarity in their application by the Division of Lands does not render that agency any better able to discern the intent of the legislature than the courts. We will therefore apply our own independent judgment as to whether the agency's interpretation complies with the legislature's intent."[36]

In our view, construction of § 305 with respect to facts in the case at bar is no more a matter for administrative expertise than it was in *Aleut Corp.*

■ Moreover, the practical considerations of applying § 305 to oil and gas lease sales do not lead us to adopt the restrictive interpretation of § 305 advocated by defendants. The state argues that the consultation requirement of § 305 would "virtually paralyze" the Division of Lands if it were applied to mineral disposals. In support of its argument, the state refers to the staking and, filing of mining claims, pointing out that the property interest in such claims can be established by an act "inherently unknowable to the Division of Lands when it occurs," thus arguing § 305 would be next-to-impossible to apply in such situations.[37] However, mining claims of the type referred to by the state are clearly distinguished by statutory section, procedure and duration from mining leases

---

32. AS 38.05.365.

33. Defendants claim that § 345 applies only by virtue of 11 AAC 82.710. However, we are unwilling to hold that notice is purely a matter of agency regulation under the Land Act, especially in light of the constitutional concern with notice expressed in Alaska Const. art. VIII, § 10.

34. 541 P.2d at 736–37.

35. *Id.* at 736 & n. 13.

36. *Id.* at 737.

37. The state has also expressed its concern over the prospect of having to consult with local communities prior to the sale of over-the-counter mineral leases. However, we find nothing about noncompetitive purchases of mineral rights that would make § 305 any more difficult to apply to them than to any other type of purchase of state lands.

under the terms of the Alaska Land Act.[38] Section 305 only applies to sales and leases, not to claims; thus the state's anxiety over the prospect of conducting joint studies every time a claim is filed is unwarranted. In contrast to the position advanced by the state regarding the need to inform local communities of its intent to sell or lease oil and gas in adjacent areas, the views of the oil industry are actively solicited prior to a lease sale, and provide the basis for determining what tracts will be offered at a sale. The practical problems of consulting with the oil and gas companies cannot be significantly less than those attendant in consulting with representatives of local communities. We note that communities which must be consulted under § 305 do not have any veto power over the sale or lease of state lands.[39]

Defendants next contend that even if § 305 is applicable to oil and gas leases, the statutory purpose of the provision was in fact satisfied. They argue that under § 305 the Division of Lands is not required to consult with communities located within an organized borough, and that, therefore, Homer and Seldovia did not need to be consulted. Defendants maintain that as to the Kenai Peninsula Borough, within which Homer and Seldovia are located, there was substantial compliance with the consultation requirement.

In *State v. Aleut Corp.*, we described the adjacency requirement of § 305 as follows:

"lands 'in or adjacent to' a community are lands which are in fact utilized on a regular or periodic basis by members of the community for legitimate economic or recreational purposes and are located within a reasonable distance of the [community]."[40]

Plaintiffs in the case at bar make their homes in, or near to, Homer and Seldovia,

both of which are located on the shores of Kachemak Bay. The economy of these cities is presently based on the tourism and fishing industries, which in turn revolve around the use of the bay. Thus we find Kachemak Bay is "adjacent to" the cities of Homer and Seldovia for the purposes of § 305.

Nevertheless, defendants maintain that because the powers of "planning, platting and zoning on an areawide basis" are delegated to the borough under AS 29.33.-070, the authority of cities located within the borough is superseded by borough powers for purposes of § 305. We disagree. Section 305 does not limit "local authorized planning agencies" to agencies with "areawide" authority. In designating the authority with whom the state must consult, the statute merely refers to "an incorporated municipality or other organized community." Homer and Seldovia clearly fall within this category. Moreover, we stated in *Aleut*:

"[I]t is clear that 'planning agencies' cannot be limited to the agencies authorized by statute to provide technical planning services to certain classes of communities."[41]

There are many land uses for which a city must plan, regardless of whether it is located within an organized borough. Homer and Seldovia will be directly affected if petroleum operations move to Kachemak Bay. Thus we hold that Homer and Seldovia should have been consulted prior to the sale of oil and gas leases located within Kachemak Bay.

Furthermore, we do not believe that the record indicates that the state complied with the consultation requirement with respect to the Kenai Peninsula Borough. Although the Borough Planning Director knew of the sale as early as September of 1973, the Planning Department

---

38. *Compare* AS 38.05.195 with AS 38.05.205. *See also* AS 38.05.210.

39. *State v. Aleut Corp.*, 541 P.2d at 739–40 n. 24.

40. *Id.* at 739.

41. *Id.* at 737.

for the Borough never studied or reviewed the lease sale proposals either on its own or in consultation with the state. The Borough Assembly did adopt a resolution urging the Department of Natural Resources to issue permits necessary to continue drilling in Kachemak Bay and Lower Cook Inlet, but the resolution was adopted after the leases were sold. We do not find that a tardy attempt of this type satisfies the mandate of § 305. Moreover, the proper agency was never consulted.

Finally, we must decide whether to apply our holding in this matter prospectively.[42] In so deciding, we weigh the equities of applying the holding enunciated today to the parties before us in light of the criteria set out in *Schreiner v. Fruit*, 519 P.2d 462, 466–67 (Alaska 1974). Three separate factors are to be considered.[43] First, to be applied prospectively, the decision "must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." [44] Second, we must evaluate the merits of retroactive or prospective application of the rule in light of its prior history, purpose and effect. Third, we must weigh the hardship and injustice of applying the rule to the litigants in the instant case.

In applying these standards to the case at bar, we are persuaded that our holding should be applied solely prospectively. The issue before us represents a question of first impression in an area of statutory law which was admittedly not as clear as it might have been.[45] A primary purpose underlying the statute is to give members of the public who will be affected by a particular disposal of state lands a voice in the disposition of those lands. However, once the disposition has occurred, the new owners or lessors also have a paramount interest in maintaining their rights to the land. We have no desire in this area, to upset settled transactions which were entered into in good faith. The title conflicts which would be engendered if every mineral lease or sale which was executed in the past became vulnerable to attack under the rule we have announced today would be enormous. If allowed, this would create insurmountable problems for the state and numerous individuals. Finally, we believe the oil company defendants in this case were entitled to rely on the Division of Lands' long-standing interpretation of § 305. Unlike our dissenting colleagues, we do not believe that the state's interpretation of the statute was implausible. Ultimately the question of prospectivity must be decided upon a broad basis. In this regard the United States Supreme Court per Cardozo, J., observed:

> "The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature." *Great N. Ry. v. Sunburst Oil & Refining Co.,* supra, at 365, 53 S.Ct. at 149.

In order to avoid any injustice, the rule we state in this case shall apply only to actions arising out of occurrences after the date of this opinion.[46]

## VI.

Defendants have urged us also to consider the question of whether plaintiffs'

---

42. *See Great N. Ry. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 363–64, 53 S.Ct. 145, 77 L.Ed. 360 (1932). *See also,* Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling,* 42 N.Y.U.L.Rev. 631 (1967).

43. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 396 (1971).

44. *Schreiner v. Fruit,* 519 P.2d at 466, *quoting Chevron Oil Co. v. Huson,* 404 U.S. at 106, 92 S.Ct. 349.

45. *See State v. Aleut Corp.,* 541 P.2d at 740 n. 25.

46. *See City of Fairbanks v. Schaible,* 375 P.2d 201, 211 (Alaska 1962) ; *cf. Scheele v. City of Anchorage,* 385 P.2d 582 (Alaska (1963).

claims were time barred by a statute of limitations. In his memorandum of decision, the trial judge noted that he did not believe that plaintiffs' claims were time barred by either AS 44.62.560 or Rule 45 of the Rules of Appellate Procedure as defendants claimed, since he did not find they applied to the facts of this case. He chose, instead, to rely upon the doctrine of laches to support his decision.

■ We agree that plaintiffs' action is not time barred under AS 44.62.560(a) [47] or Alaska App.R. 45(a)(2).[48] As noted above,[49] the jurisdictional basis for this suit is not § 560(a), but rather Alaska Const. art. VIII, § 10. *Alyeska Ski Corp. v. Holdsworth,* 426 P.2d 1006, 1012 and n. 22 (Alaska 1967); *see United States Smelting R. & M. Co. v. Local Boundary Comm'n,* 489 P.2d 140, 142 (Alaska 1971); *Union Oil Co. v. State,* 526 P.2d 1357, 1365 n.12 (Alaska 1974).[50] Any action for declaratory judgment must also rely on AS 22.10.020(b) for jurisdiction, which section allows the Alaska Courts to provide declaratory relief. Neither provision imposes a 30-day limitation on actions brought under them. Since, as we have seen above, the administrative process as it concerns plaintiffs in this case was not an adjudicatory proceeding, we will not judicially impose a 30-day limitation by analogy to AS 44.62.-560 or App.R. 45.[51]. We note that judicial review from non-adjudicatory legislative action is provided in the Alaska A.P.A. under AS 44.62.300, which section specifically provides for declaratory relief, but not for a statute of limitations on actions. We do not mean to imply that oil and gas lease sale proceedings must comply with the formal requirements provided for administrative regulations, but we do find a better procedural analogy in § 300 for this case, where the public interest is being advanced in a declaratory judgment action by persons not party or privy to the administrative proceeding below. Plaintiffs are not time barred from bringing this action.

### VII.

Finally, there is a dispute in the trial court over which of the evidentiary materials proffered by plaintiffs were cognizable under Civil Rule 56. The controversy concerns administrative files pertaining to the lease sale which were obtained from the Division of Lands and various other state agencies. The files contain, for the most part, interoffice memoranda and opinion letters, documents, notices and correspondence, including many letters from Homer residents expressing their concern over the sale. The trial court chose to admit the materials which had been obtained directly from the Division of Lands, but refused to consider the documents originating with other state agencies and state officials. Plaintiffs argue that the trial court's failure to consider the additional documents was error. Defendants, on the other hand, contend that the trial court was correct in refusing to consider those documents, and that it erred in considering the files obtained from the Division of Lands.

■ Defendants maintain that the documents in question are either unauthenticated or contain hearsay, and therefore were not properly before the trial court in

---

47. AS 44.62.560(a) provides in relevant part: "Except as otherwise provided by this section, the notice of appeal shall be filed within 30 days after the last day on which reconsideration can be ordered, and served on each party to the proceeding."

48. Alaska App.R. 45(a)(2) provides in relevant part:
"The time within which an appeal may be taken to the superior court from an administrative agency shall be 30 days from the date that the order appealed from is mailed or delivered to the appellant."

49. *See* note 23 *supra.*

50. *See also Swindel v. Kelly,* 499 P.2d 291, 297 & n. 22 (Alaska 1972).

51. We are persuaded by reading the language of these provisions that they are inapposite to the facts of the case at bar.

a summmary judgment proceeding. We have recently observed that "unauthenticated and unsworn documents, and uncertified copies of public records are not admissible in evidence and cannot be relied upon for the purposes of summary judgment." *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough, supra* at 450. However, we believe that the public records proffered by plaintiffs were authenticated. Civil Rule 44(b). *See* AS 09.25.120. They were produced by the state in the course of discovery proceedings in response to plaintiffs' request for "the complete sale file of Competitive Oil and Gas Lease Sale No. 28." In offering these materials to plaintiffs, the state in effect represented that they were genuine. Moreover, it is generally agreed that an official writing is authenticated if it is proved to have come from the proper public office. C. McCormick, Evidence § 191(b), at 403 (1954). Finally, we note that when plaintiffs' counsel received the files from the Division of Lands, he sought and obtained a letter from their custodian certifying that they were true and correct. As to hearsay statements not covered by the official records exception to the hearsay rule, they are admissible for the purpose of demonstrating notice or knowledge.

We reverse in part, and affirm in part. The case is remanded for further proceedings consistent with this opinion and the separate opinion of Justice Rabinowitz.

RABINOWITZ, Justice, with whom ERWIN and BURKE, Justices, and DIMOND, Justice Pro Tem, join.

While I agree with Justice Connor's treatment of the laches question and the appellants' contention based on AS 38.05.-345, I dissent from his analysis of appellants' second claim on the merits. That claim was that the sale was unlawful because it was not preceded by a reasoned finding made by the Director of the Division of Lands that the sale would best serve the interests of the state. Resolution of this claim requires review of relevant constitutional measures as well as statutory language. The framers of our state constitution were united in the view that the lands and other natural resources of this abundant state are among its most prized assets. Although favoring productive use of these resources, the framers believed that development should proceed only when it benefited the people of the state and only in compliance with applicable constitutional and statutory processes. This philosophy they wrote into our constitution:

> It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.[1]

> \* \* \* \* \* \*

> Subject to the provisions of this section, the legislature may provide for the sale or grant of state lands, or interests therein, and establish sales procedures. All sales or grants shall contain such reservations to the State of all resources as may be required by Congress or the State and shall provide for access to these resources. Reservation of access shall not unnecessarily impair the owners' use, prevent the control of trespass, or preclude compensation for damages.[2]

> No disposals or leases of state lands or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law.[3]

In fulfillment of this constitutional mandate, the legislature has enacted in the Alaska Land Act a number of procedural safeguards to insure wise utilization of our

---

1. Art. VIII, sec. 1.

2. Art. VIII, sec. 9.

3. Art. VIII, sec. 10.

valuable lands.[4] One of these is AS 38.-05.035(a)(14), which provides:

The director shall . . .

\* \* \* \* \* \*

(14) when he finds that the interests of the state will be best served, he may, with the consent of the commissioner, approve contracts for the sale, lease, or other disposal of available lands, resources, property or interest in them. . . .

Appellants contend that prior to any disposition of state lands the legislature has imposed in AS 38.05.035(a)(14) a procedural prerequisite, namely, a reasoned evaluation of the wisdom of a proposed disposition of land and a determination that the disposition is in the best interests of the state. Although appellants concede that the Director is not required by this statute to hold public hearings, they insist that he is required to make a written finding or at least establish a record which demonstrates the basis for his decision that a particular sale of oil and gas leases best serves the interests of the state.

The appellees respond with the contention that the decisions and actions which culminated in the sale of the Kachemak Bay leases are not reviewable and were factually prompted by considerations of public policy. In their arguments before this court, the oil companies emphasize the broad discretion conferred upon the Director in determining the public interest, insisting that the very breadth of that discretion insulates his decisions from judicial review. More particularly, the appellees assert that "[t]here is simply no statutory authority nor any judicially manageable substantive standards for judicial review of the purely executive policy decisions made and actions taken in this case."

Appellees are unquestionably correct in their assertion that the Director enjoys broad discretion in deciding whether to approve a sale, lease or other disposal of state lands, but this misconceives the nature of appellants' claim. The argument is not that the Director made a substantive error in determining whether or not Alaska's interests would be best served by the Kachemak Bay sale, but that the Director never considered the question at all. It is a claim of procedural error. The issue of reviewability therefore is whether our courts can review the performance of administrative tasks by an executive agent to ensure compliance with specific procedural safeguards imposed by the legislature in accordance with Alaska's constitutional mandates. Our prior decisions have established both the judicial power and responsibility to undertake such review.

Among the procedural safeguards applicable to the leasing of public lands are those found in AS 38.05.075 and the regulations enacted pursuant to AS 38.05.-020(b)(1), considered in *Alyeska Ski Corp. v. Holdsworth,* 426 P.2d 1006 (Alaska 1967). In that case we examined whether an unsuccessful bidder could obtain judicial review of an auction of leaseholds on state lands allegedly conducted in violation of

---

4. Among these safeguards are: AS 38.05.055, which requires that sales of land be conducted by public auction and sets forth bidding and receipt procedures for such auctions; AS 38.05.065, which establishes the terms which may be set for the sale of land following a successful bid; AS 38.05.075, which prescribes procedures for the public auction of leaseholds of public land other than for the extraction of natural resources; AS 38.05.080, which authorizes the Commissioner to override the Director and reject all leasehold bids "when the best interest of the state justifies [the] action;" AS 38.05.082, which establishes procedures by which the Director may lease tide and submerged lands for fisheries development; AS 38.05.120, providing for procedures for the disposal of timber and other materials on state lands; AS 38.05.135, which directs that leaseholds of mineral deposits may be sold on a competitive bid basis "when determined by the commissioner to be in the best interests of the state;" AS 38.05.145, establishing leasing procedures for leaseholds of mineral deposits; AS 38.05.305, requiring joint study and review prior to disposition of most state lands; and AS 38.05.310, which requires notice and appraisal.

these statutory and regulatory procedures.[5] *Holdsworth* held that the management by the Director of an auction pursuant to AS 38.05.075, and the supervision of that sale by the Commissioner of Natural Resources, was subject to judicial review. Our rationale emphasized that paramount responsibility of the judiciary to guarantee compliance with the law:

> We reach this conclusion in light of the text of section 10, article VIII of the Alaska constitution which prohibits leasing of state owned lands unless made pursuant to public notice and other limitations imposed by law. This article of our constitution reflects the framers' recognition of the importance

of our land resources and of the concomitant necessity for observance of legal safeguards in the disposal or leasing of state lands. Neither the minutes of our constitutional convention nor the legislature history of the Alaska Land Act demonstrates that it was intended to make unreviewable leasing decisions of the director and the commissioner . . . .

In light of the constitutional, statutory, and regulatory provisions alluded to, we conclude that it was not intended that Alaska's courts be divested of their constitutionally vested duty to insure compliance with the laws of Alaska.[6]

---

5. AS 38.05.075 provides in full:
 The leasing shall be made at public auction to the highest qualified bidder as determined by the director. An aggrieved bidder may appeal to the commissioner within five days for a review of the director's determination. When a valid existing federal grazing lease is cancelled to allow state selection of the area under lease, the lessee of the lands has the preference right to lease the lands without competitive bidding for a term equal to that originally granted in the cancelled federal lease and upon terms as favorable to the lessee as those contained in the cancelled federal lease. The leasing shall be conducted by the director, or his representative, and the successful bidder shall deposit the first year's rental, or that portion of it which the commissioner requires, in accordance with his bid. The director or his representative shall immediately issue a receipt containing a description of the land or interest leased, the price bid, and terms of the lease. The receipt shall be acknowledged in writing by the bidder. A lease, on a form approved by the attorney general, shall be signed by the lessee and, upon approval by the commissioner, shall be signed by the director.
 Among the regulations involved, 11 AAC § 203.02 (1962) provided in part:
 An applicant or bidder for a lease is qualified if the applicant or bidder:

 . . . . .

 (d) is acting as an agent for another and has qualified by filing with the Director, prior to the time set for the auction, a proper power of attorney or a letter of authorization creating such agency. The

 agent shall represent only one principal, to the exclusion of himself.
 11 AAC § 302.15 (1963) provided in part: The apparent high bidder . . . shall concurrently deposit with the Division, such portion of the minimum annual rental as the Director has indicated, plus a deposit to cover the costs of advertising, appraisal and survey in cash and/or certified check and/or cashier's check and/or money order.
 The requirement of "cash and/or certified check and/or cashier's check and/or money order" was deleted when § 302.15 was amended in 1965.

6. 426 P.2d at 1011–12 (footnotes omitted). Any attempt to distinguish *Holdsworth* on the grounds that that case involved an unsuccessful participant in the bidding process must be unavailing. We expressly declined to restrict the availability of judicial review that narrowly:
 In reaching this conclusion, we again emphasize that here we are concerned with an unequivocal constitutional mandate requiring that all leases of state lands are to be entered into in accordance with safeguards imposed by law. This constitutional mandate, together with AS 38.05.075, furnishes a significant basis for distinguishing [a contrary] line of cases. We construe AS 38.05.075 as a manifestation of the legislature's intent to authorize an aggrieved bidder to maintain an action seeking judicial review so that the public interest, in adherence to law in the disposal and leasing of state owned lands, may be vindicated. We do not intend, nor do we now hold, that an aggrieved bidder is the

Subsequent decisions have reaffirmed this court's commitment to that constitutional responsibility. In *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351 (Alaska 1971), we recognized limited judicial review of the decisions of the Commissioner of Economic Development in the face of a statute expressly ascribing finality to his actions. The rationale of *Murkowski* was that the constitutionally vested duty of this court required judicial review to ascertain whether the applicable rules of law and procedure were observed.[7] The judicial review undertaken in *Murkowski* was a scrutiny of administrative compliance with procedural norms, not a *de novo* evaluation of the wisdom of the substantive executive-administrative decisions reached. Beyond fulfilling this court's constitutional responsibility, judicial review which focuses upon compliance with administrative procedures comports with considerations of Alaska's allocation of governmental powers among separate branches, and with notions of judicial competence. These functional considerations were noted in *United States Smelting, Refining & Mining Co. v. Local Boundary Commission,* 489 P.2d 140 (Alaska 1971), a case reviewing the procedures of the executive agency exercising annexation powers. We remarked:

> [E]ven in light of purported administrative finality *Murkowski* permits judicial review of an administrative decision to ascertain whether the 'applicable rules of law and procedure where observed.' . . . Without doubt there are questions of public policy to be determined in annexation proceedings beyond the province of the court. Examples are the desirability of annexation, as expressed in published standards. Judicial

techniques are not well adopted to resolving these questions. In that sense, these may be described as 'political questions,' beyond the compass of judicial review. But other annexation issues, such as whether statutory notice requirements were followed, are readily decided by traditional judicial techniques. *Murkowski* clearly permits this latter type of review.[8]

More recently, in *State v. Aleut Corp.,* 541 P.2d 730 (Alaska 1975), a claim quite similar to the one at hand was advanced, namely, that during the course of a public land auction the Division of Lands had failed to comply with a procedural safeguard expressly required by the Alaska Land Act.[9] In *Aleut* we expressly rejected a deferential standard of review, which would have sustained the administrators' action if it appeared there had been a "reasonable basis" for their belief that they had complied with the procedural requirements of the Act. In articulating the appropriate standard of review, we held that this court would exercise its own independent judgment as to whether the administrative agency had complied with the legislature's intent, observing that

> . . . when determining questions of whether proper procedures were observed, whether the administrative agency has acted within the scope of its authority, or whether an agency's interpretation of regulations is consistent with the statutes on which they are based, we are not faced with problems involving specialized knowledge or administrative expertise.[10]

This court is by no means alone in its view that judicial review must be provided to ensure that administrative actions com-

---

sole or exclusive party through whom these important public interests are to be secured. . . .

*Id.* at 1015 (footnote omitted).

7. 486 P.2d at 357; *accord United States Smelting, Refining & Mining Co. v. Local Boundary Comm'n,* 489 P.2d 140, 143 (Alaska 1971).

8. 489 P.2d at 143.

9. It was there claimed that the state failed to comply with AS 38.05.305, which requires joint study and review of proposed land sales by the director and local authorized planning agencies prior to sale. Appellants here have raised a similar claim.

10. 541 P.2d at 736.

ply with the procedural prerequisites imposed by legislation. Federal courts have' stood ready to scrutinize agency conduct, particularly when, as here, a challenge to that conduct raises the claim that environmental concerns have been disregarded. Perhaps the leading federal case remains *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971), a challenge to a federal highway project which had been routed through public park lands. The Secretary of Transportation had authorized construction of the project, although applicable legislation permitted him to approve such a route only if no "feasible and prudent" alternate route existed and there had been "all possible planning to minimize harm" to the park.[11] The challenging litigants, private citizens and conservation organizations, contended (among other things) that the Secretary had failed to exercise his independent judgment prior to authorizing the construction, contrary to Congressional intent. In response to a contention by the Secretary that the exercise of his discretionary powers was unreviewable, the United States Supreme Court held that

limited judicial review was in fact available. Among the issues subject to review was the question whether the Secretary had properly understood the confines of his authority and had consciously undertaken the required evaluation prior to granting authorization.[12]

Congressional use of procedural safeguards as a check on administrative actions perhaps reached its zenith in the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. (1970). NEPA prescribes certain procedural measures to ensure that environmental values are respected. Among these are the Section 102 requirements that all federal agencies consider environmental amenities in their decision-making processes[13] and file detailed environmental impact statements when undertaking "major Federal actions." [14] Although the federal courts remain sharply divided whether they may review the substantive merits of the conclusions reached in an environmental impact statement,[15] all agree that they may review compliance with the procedural obligations of the Act. In the words of one early decision to this effect,

11. The legislation involved was § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1970), and § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138 (1970).

12. In the words of the Supreme Court:
The court is first required to decide whether the Secretary acted within the the scope of his authority. . . . This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion. L. Jaffe, Judicial Control of Administrative Action 359 (1965). As has been shown, Congress has specified only a small range of choices that the Secretary can make. Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can reasonably be said to be within that range. The reviewing court must consider whether the Secretary properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems. And the re-

viewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems. 401 U.S. at 415–16, 91 S.Ct. at 823, 28 L.Ed. 2d at 153. Assuming the Secretary had in fact made the requisite determinations, the Court also approved limited review of the substantive merits of those decisions, to ensure that the choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* The *Overton Park* opinion relies to some extent upon the terms of the federal Administrative Procedure Act, particularly 5 U.S.C. § 706 (1970). Although the comparable state act is not applicable to the case at bar, we do not view that difference as controlling.

13. 42 U.S.C. § 4332(B) (1970).

14. 42 U.S.C. § 4332(C) (1970).

15. *National Wildlife Federation v. Morton,* 393 F.Supp. 1286, 1296 n. 12 (D.D.C.1975).

. . . Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: 'It is hard to imagine a clearer or stronger mandate to the Courts.' [16]

The Supreme Court has recently confirmed this view.[17]

Other federal legislation has used the device of procedural safeguards to check administrative discretion when environmental concerns are at stake. Little would be gained by a lengthy review of the numerous cases which have enforced those procedural obligations through the mechanism of judicial review.[18] Suffice it to say, courts rarely hesitate to review an administrator's actions when it is claimed that he failed to comply with procedural prerequisites expressly imposed by statute. Even the appellees' arguments suggest this understanding. In the case at bar, appellants have alleged violation of three procedural duties imposed by the Alaska Land Act: the reasoned determination requirement of AS 38.05.035(a)(14), the notice requirement of AS 38.05.345, and the joint study and review requirement of AS 38.05.305. Although appellees challenge judicial review of the claim based on AS 38.05.035(a)(14), they incongruously accept reviewability of the latter two allegations.

■ ■ ■ ■ We therefore hold the appellants' contention that the Director of the Division of Lands failed to determine that the Kachemak Bay sale would best serve the interests of the state, as required by AS 38.05.035(a)(14), prior to the sale of the leases in this case, is judicially reviewable.[19] The legislative procedural directive of AS 38.05.035(a)(14) requires

16. *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971), *quoting Texas Comm. on Natural Resources v. United States*, 1 Envir.Repts.Cases 1303, 1304 (W.D.Tex.1970). *Accord Sierra Club v. Stamm*, 507 F.2d 788 (10th Cir. 1974); *National Helium Corp. v. Morton*, 486 F.2d 995 (10th Cir. 1973); *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972); *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App. D.C. 380, 463 F.2d 783 (1971).

17. *Aberdeen & Rockfish R. R. v. SCRAP*, 422 U.S. 289, 96 S.Ct. 2336, 45 L.Ed.2d 191, 215 (1975).

18. *See e. g., Environmental Defense Fund v. Hardin*, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970) (involving provisions of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 135 et seq. (1970)); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (4th Cir. 1972) (involving the Federal-Aid Highway Act of 1968, 23 U.S.C. § 101 et seq. (1970), and other legislation); *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608 (2d Cir. 1965), *cert.*

*denied*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) (Federal Power Act, 16 U.S.C. § 803(a) (1970).

19. Justice Connor's conclusion to the contrary relies primarily upon a passage from Professor Davis' Administrative Law Treatise which discusses the "presumption of regularity" afforded administrative action in *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138 (1935), and other cases. We prefer the language of a more recent Supreme Court decision, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136, 153 (1971) (emphasis added):

> Certainly, the Secretary's decision is entitled to a presumption of regularity. See, e. g., *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138, 146 (1935). . . . But that presumption is not to shield his action from a *thorough, probing, in-depth review.*

In addition, the discussion of the record which follows demonstrates persuasive reasons for disregarding the presumption in this particular case.

of the Director an independent, reasoned evaluation of a proposed sale. Although he is not expressly obligated to make a formal written finding, he must at a minimum establish a record which reflects the basis for his decision.[20]

 Ordinarily this court would remand the question to the superior court for a determination whether the Director of the Division of Lands, F. J. Keenan, complied with the requirements of AS 38.05.-035(a)(14) prior to the sale of the Kachemak Bay leaseholds. In this particular case, however, a remand as to that issue is unnecessary, because the record demonstrates that the Director made no reasoned evaluation prior to the sale. The record discloses that after nominations were received from the oil industry, Pedro Denton, Chief of the Minerals Section of the Division, sent to Charles Herbert, Commissioner of the Department of Natural Resources, a recommendation to include large parts of Kachemak Bay in the oil and gas lease sale. A few weeks later, on October 19, 1973, Commissioner Herbert approved the proposed sale. Notice of the pending sale of the Kachemak Bay tracts was immediately given to the oil industry. In succeeding weeks the staff of the Department of Fish and Game submitted recommendations to delete the Kachemak Bay tracts from the sale, but they were apparently disregarded.

There is nothing in the record to suggest that Director Keenan played an active role in the decision-making process leading to the sale of the leases. Counsel for the State explicitly conceded in the superior court that at no time did the Director make the reasoned determination that the sale best served the interests of the state:

> And certainly as all counsel will recall when the deposition of Mr. Keenan was taken, it was admitted that there was no finding on his part, and frankly I have not considered that an issue in this case.
>
> THE COURT: That there was no finding?
>
> MR. REEVES: That's correct, that there was—well at this point, you see, I think it was fair to those of us defending this case, to assume that they're contending that there was supposed to be some finding, some mental process, and the director stated that as far as he was concerned, there was none for him.

The deposition of Director Keenan bears out this concession.

 In their briefs before this court certain defendants reaffirm this concession by arguing that the decision to approve the sale was actually made by the Commissioner of Natural Resources, the immediate superior of Director Keenan, and that the Commissioner's approval sufficed to satisfy the requirements of AS 38.05.035(a)(14).

20. The purpose of this record is not to enable the court to undertake an elaborate reconsideration of the substantive merits of the Director's decision at some later date. Under the constitutional principles discussed previously, this court has neither the authority nor competence to decide whether the public interest is "best served" by a proposed disposition of land. Nonetheless, a limited review of the Director's decision would be available simply to ensure that it was not arbitrary, capricious, or prompted by corruption. A record is necessary to facilitate this check, as illustrated by an earlier decision involving review of another discretionary executive decision. *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 98–99 (Alaska 1974), was a challenge to a decision of the Commission to authorize incorporation of the North Slope Borough. We said (emphasis added):

> [The] Commission has been given a broad power to decide in the unique circumstances presented by each petition whether borough government is appropriate. Necessarily, this is an exercise of delegated legislative authority to reach basic policy decisions. Accordingly, acceptance of the incorporation petition should be affirmed *if we perceive in the record* a reasonable basis of support for the Commission's reading of the standards and its evaluation of the evidence.

*See also Jager v. State*, 537 P.2d 1100 (Alaska 1975); *Swindel v. Kelly*, 499 P.2d 291 (Alaska 1972).

It is true that the Commissioner enjoys broad powers under AS 38.05.020, including the authority to "review any order or action of the director"[21] and to "exercise the powers and do the acts necessary to carry out the provisions and objectives" of the Act.[22] Although the responsibility under AS 38.05.035(a)(14) for determining that a proposed sale best serves the interests of the state in the first instance falls to the Director, the legislature apparently contemplated that the Commissioner could *on occasion shoulder that responsibility.*[23] Logically, the legislature must have had in mind that when the Commissioner, in the exercise of his AS 38.05.020 powers, assumed this responsibility, he should do so in a clear and explicit manner. Otherwise the delineation of functions between the two offices might grow so uncertain that, with respect to a particular sale, neither official would undertake the comprehensive evaluation required by AS 38.05.035(a)(14).

Here the record suggests that Commissioner Herbert played an active role in the planning of this sale. We do not find evidence, however, that the Commissioner expressly relieved Director Keenan of his obligation to make a "best interest" evaluation. Thus, a majority of the Justices of this court conclude that this is a matter which should be explored further in the superior court. This court therefore remands this case with directions that the superior court determine whether the Commissioner lawfully assumed the obligation imposed by AS 38.05.035(a)(14) to evaluate the sale, whether his October 19, 1973, approval of the sale reflected a determination that the sale best served the interests of the state, and whether he set forth findings or a record which demonstrated the basis for that determination.

DIMOND, Justice Pro Tem, with whom Justice RABINOWITZ joins, dissenting.

The majority holds that prior to the sale of the oil and gas leases located within Kachemak Bay, the state had the obligation under AS 38.05.305[1] to study and review the proposed leases with the communities of Homer and Seldovia, and also with the Kenai Peninsula Borough. But then the majority goes on to hold that despite this requirement, and the failure of the state to comply with it, the decision that compliance with the statute was essential would have a solely prospective effect so as to apply only to actions arising out of occurrences after the date of this opinion. With this holding only, I dissent. In my opinion, the court's decision should apply to the plaintiffs in this case, and thereafter prospectively.

The majority's reason for holding its decision prospective is that once the oil and gas lease sales had been made, the new owners or lessors had a paramount interest in maintaining their rights to the land, and that the court has no desire to upset the settled transactions which were entered into in good faith.

I disagree that the oil company's interest is paramount to the interest of the communities of Homer and Seldovia in being consulted and heard before the lease sales were made. Those communities, and in particular the fishermen plaintiffs in this case, have a vital interest in the rich fish-

---

21. AS 38.05.020(b)(3).

22. AS 38.05.020(b)(4).

23. The very terms of AS 38.05.035(a)(14) also evidence the legislature's intent that the Commissioner remain involved in the Director's determination:

 (a) the director shall

 . . . . .

 (14) when he finds that the interests of the state will be best served, he may, *with the consent of the commissioner,* approve contracts for the sale, lease, or other disposal of available lands. . . . (emphasis added)

1. AS 38.05.305 provides:
 Except for land disposed of under §§ 315–325 of this chapter, no land in or adjacent to an incorporated municipality or other organized community may be sold or leased, or a renewal lease issued, until the proposed use of the land has been studied and reviewed jointly by the director and local authorized planning agencies.

ery resources in Kachemak Bay which may well be adversely affected by the exploration for and extraction of oil and gas from those waters. What the majority is holding, in reality, is that the state in this case may simply ignore the provisions of Sec. 305, which expressly prohibits the sale or lease of land adjacent to organized communities, such as Homer and Seldovia, until there has been a joint study and review by the state in those communities. Of course, this holding would apply in the future, but the fact that it is applied here is, in my opinion, an unfortunate judicial condonation of arbitrary and capricious administrative action.

One attempted justification for the court's holding as to prospectivity, is that the application of Sec. 305 represents a question of first impression in an area of statutory law "which admittedly was not as clear as it ought to have been." In support of this proposition, the majority cites *State v. Aleut Corporation*, 541 P.2d 730, 740 n. 25, where it was stated:

> It is open to the Division of Lands to diminish areas of vagueness and uncertainty inherent in the present wording of AS 38.05.305 through its rule-making power or by seeking amendatory legislation.

There may have been some uncertainty in the application of Sec. 305 in that case, which involved the question of whether certain unincorporated rural villages fell within the classification of an "other organized community", within the wording of Sec. 305, or were "adjacent" to the lands that were sold. But there is no such uncertainty here. Homer and Seldovia have been incorporated municipalities for many years, and there is no question that Kachemak Bay is immediately adjacent to those communities. I fail to see how Sec. 305 could be any more explicit and meaningful in its application to Homer and Seldovia than is obvious from its plain language.

The majority opinion may be referring to another type of uncertainty in regard to Sec. 305, i. e., whether it was applicable to leases of oil and gas lands. The majority states that the defendant oil companies in this case were entitled to rely on the long standing interpretation of Sec. 305 by the Division of Lands, which was that Sec. 305 was not applicable to the sale of oil and gas leases. The court speaks of the state's "interpretation" of that statute, which implies an uncertainty or ambiguity. But there simply is none and never was. Sec. 305, coupled with the definition of "lands" in AS 38.05.365,[2] leaves no room for interpretation.

Those sections read together can have only one meaning—the one the court has stated it to have. This is not only true now, but was true from the time the statutes were enacted. The Division of Lands' so called "long standing interpretation" was simply wrong from the beginning—a remarkable and unexcusable failure to read and understand plain English. There was no room for "interpretation", because there was nothing to clarify the meaning of. When the transactions here took place, the oil company defendants had nothing to rely upon except the fact that the state's failure to consult with the communities of Homer and Seldovia was a fatal flaw which would affect the validity of the sales of the oil and gas leases.

An additional justification for holding the decision to be purely prospective is that title conflicts would be engendered, and insurmountable problems for the state and numerous individuals would be created if every mineral lease or sale executed in the past became vulnerable to attack under the holding that Sec. 305 requires, before public lands can be leased and sold, that adjacent communities be first consulted. Possibly this could be true if the holding of the court were held to be entirely retro-

---

2. AS 38.05.365, entitled "Definitions", provides in pertinent part:
 . . . (16) 'state lands' or 'lands' means all lands, including shore, tide and sub-

merged lands, or *resources* belonging to or acquired by the state; (emphasis added).

spective in effect. But this is not what I am urging. As I have stated, my position is that the plaintiffs in this case should receive the benefit of the court's decision, since they brought the issue to the court's attention, and thereafter the decision could be held to be prospective in effect.[3] If this is done, the fears expressed by the majority as to conflicts and insurmountable problems have no foundation.

In determining whether to apply a decision prospectively, the courts have considered various criteria, as the majority has pointed out in its reliance on our decision in *Schreiner v. Fruit,* 519 P.2d 462 (Alaska 1974). But I believe the question can best be dealt with and decided by simply considering the elements of hardship and basic fairness or justice.[4]

I fail to see why the defendants will suffer any serious hardship by applying the court's decision to the plaintiffs in this case, and thereafter prospectively. Since Sec. 305 was not complied with, the sale of the oil and gas leases was invalid and of "no legal force and effect".[5] By setting aside the sale, and reimbursing the oil company defendants the monies they paid for the leases, the defendants are left in essentially the same position they would have occupied had the sales not taken place. And it is significant to note, as the majority has pointed out on the laches question, that there has been no serious prejudice to the defendants by reason of plaintiffs' delay in bringing this action. This is by no means a case where application of the majority's decision to the plaintiffs here would cause "injustice and oppression . . . so great as to be intolerable."[6]

On the question of justice, I submit that basic fairness requires the application of the court's decision to the plaintiffs in this case. Sec. 305 was clearly violated. It is also clear that adherence to the requirements of this statute was essential to cause the lease sales to be effective. The plaintiffs are the ones that have gone to the trouble and expense of bringing this matter to the attention of the judiciary, and of obtaining a decision that justified their action. It is hardly fair in these circumstances to place the plaintiffs in the position of unselfish public-spirited citizens, whose only object was to help enforce the law solely for the utilization of future litigants.[7] The majority is in effect advising the plaintiffs that they were correct; that the requirements of Sec. 305 ought to have been followed, but were not; that the communities of Homer and Seldovia ought to have been consulted before the lands in Kachemak Bay were leased or sold, but were not—but that despite all of this, the plaintiffs have no recourse at all in having the law complied with for their benefit. In effect, the majority is telling the plaintiffs they have won the battle—but have lost the war.

This decision appears to me to be inconsistent with the majority's expressed concern, on the laches question, regarding the assurances made by the state, time and time again, which underplayed the importance of the lease sale itself to its citizens of the Homer area, giving them a false sense of security; and the plaintiffs' fruitless efforts to make their views known to the state. Obviously, if Sec. 305 had been complied with, the plaintiffs would

3. This is what was done in *State v. Aleut Corporation,* 541 P.2d 730, 740, n. 25 (Alaska 1975), and in the case relied upon by the majority to support its holding of sole prospectivity—*City of Fairbanks v. Schaible,* 375 P.2d 201, 211 (Alaska 1962).

4. See *Warwick v. State,* 548 P.2d 384, 393–94 (Alaska 1976), and at 395–96, the quotation from Justice Cardozo, *The Nature of the Judicial Process.*

5. *State v. Aleut Corporation,* 541 P.2d 730, 740 (Alaska 1975).

6. *Warwick v. State,* 548 P.2d 384, 395–96 (Alaska 1976) quoting from Justice Cardozo, *The Nature of the Judicial Process,* 146–49 (1921).

7. See *People v. Hitch,* 1 Cal.3d 159, 113 Cal. Rptr. 158, 527 P.2d 361, 372 (1974) (dissenting opinion of Justice Mosk). And see also our recent opinion in *Lauderdale v. State,* 548 P.2d 376, 383 (Alaska 1976).

have had the opportunity to air their views. It is not too much to require that in a spirit of fair play, the citizens of Homer and Seldovia should be given the opportunity to be heard on the question of whether there should be oil and gas development in the waters of Kachemak Bay prior to the state's determination of that question. This not only would be in compliance with the law, as declared by the court, but would be in keeping with the philosophy of the Alaska Constitution, where it is provided in art. VIII, sec. 10 that—

> No disposals or leases of state lands or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law.

I would reverse and grant the relief sought by the plaintiffs in their complaint, which is to set aside the sales of the oil and gas leases to the oil company defendants.